Fordyce v. Woman's Christian National Library Association.

Opinion delivered July 2, 1906.

1. Charity—public library.—An association formed for the purpose of founding a free public library, having no capital stock and no provision for making dividends or profits, is a public charity. (Page 555.)

2. Patent—conveyance for library—effect.—Where a library association was formed for the purpose of establishing, providing and keeping a library for the free use of the public generally, and lots were conveyed by the United States by a patent absolute on its face, under an act of Congress authorizing the association to purchase for the uses and purposes of the association, a fee simple was created, and not a base or qualified fee. (Page 557.)

3. Base fee—effect.—A base or qualified fee, during its continuance, has all the incidents of a fee simple, being descendible and assignable, and liable to seizure and sale under execution. (Page 557.)

4. CHARITY—EXEMPTION OF PROPERTY.—The property of a charity can not be sold under execution issued on a judgment rendered for the nonfeasance, misfeasance or malfeasance of its agents or trustees. (Page 557.)

5. SAME—EFFECT OF JUDGMENT AGAINST.—Though a charitable association permitted a judgment to go against it upon a claim for alleged negligence of its trustees which it might have successfully defended, such judgment merely settles the amount of the claim, and does not conclude the question as to the liability of its property to seizure under execution. (Page 565.)

Appeal from Garland Circuit Court; *Alexander M. Duffie,* Judge; affirmed.

### STATEMENT BY THE COURT.

On the 29th day of June, 1881, several ladies filed a petition in the Garland Circuit Court, praying that they might be incorporated under the name of the "Woman's Christian National Library Association" "for the purpose of establishing, providing and keeping in the City of Hot Springs, Garland County, Arkansas, a library for the free use of the public generally, and of soliciting and receiving donations and aid for said purposes."

The constitution presented with the petition was preceded by the following preamble:

"We whose names are annexed, desiring to form an association to organize a reading-room and library for our own benefit, and that of the multitude of people who visit our city in search of health and pleasure, do pledge ourselves to be governed by the following constitution:"

Then follow provisions as to membership: Any lady might become a member by paying an initiation fee of two dollars annually and twenty-five cents monthly dues. Persons of either sex might become honorary members for life on payment of $50; and any one might become a "life patron" on payment of $250.

The object of the association was further stated as follows:

"The object of this association shall be to provide books, newspapers and magazines of such character as will afford instruction and diversion; but such books and papers as are demoralizing in their tendency or subversive of religion shall not be admitted;" also to provide a suitable and attractive building

where the literature of the association may be permanently lodged, and where suitable lectures on such subjects as are not in the field of political or theological controversy and other entertainment not in conflict with the objects of the association may be given."

Having been duly incorporated, application was made by the association to Congress for leave to erect a library building on the Government reservation at Hot Springs. This was refused; but Congress passed an act approved July 8, 1882, authorizing the association to purchase "for the uses and purposes of such association" lots 11 and 12 in block 127 in the city of Hot Springs. 22 Statutes at Large, 155.

These lots, having been previously appraised by the United States, were now entered by the association on payment of $100, and a patent was accordingly issued by the President. The patent contains no limitation or condition except one forbidding the boring for hot water on the lots conveyed.

Preparatory to building a house on these lots for the proposed library, the association employed one Murray to excavate the rock on the mountain side, so as to secure a proper foundation; and while this work was in progress, resort was had to blasting, whereby one Thomas had his leg broken by a shattered piece of rock thrown out into the street. To recover damages for this injury, Thomas brought suit against the association in the United States Circuit Court held at Little Rock, in which he recovered a judgment for $7,642 on the 21st of December, 1893. Execution having issued on this judgment, the lots were sold under it, and were bought by Wood & Henderson for $5,000, and in due time they received the marshal's deed therefor. Wood & Henderson afterwards conveyed the lots to the appellants, Fordyce and McKee.

On the 21st of June, 1902, the Library Association brought an action in the Garland Circuit Court against Fordyce and McKee to recover the lots, alleging that the association was merely a trustee, holding them for a public and charitable use, having no beneficial interest that could be seized or sold under execution to satisfy a judgment against the association for the negligence or torts of its agent; and that the defendants intended

to divert the property from its charitable uses, and to apply it to the uses of a street car line.

The defendants demurred; the demurrer was sustained, and the plaintiff appealed to this court, which reversed the judgment of the court below; but as there was not a full bench, and the judges were not agreed as to the grounds of reversal, the merits of the cause were not fully passed upon. See *Woman's Christian National Library Association* v. *Fordyce, ante,* p. 532.

On a second trial in the court below the plaintiff recovered a judgment for the lots and $200 for damages by reason of their detention; and defendants appealed.

*Wood & Henderson* and *Ratcliffe & Fletcher,* for appellants.

1. The purposes of the association are set out in its constitution and the preamble thereto, and from the undisputed record it is clear that it is not a public charitable association, within the meaning of that term. It is liable for the torts of its agents and employees, and its property, whether domicil or otherwise, is subject to execution therefor. 119 Mass. 1; 165 Mass. 280; 129 Mass. 367; 146 Mass. 163; 2 Grant's (Pa.) Cases, 75; 11 N. Y. 243; 73 Wis. 257; 2 Kent, Com. § 274. Conceded that where the public is directly interested in the operation of a corporation, and would be greatly inconvenienced by the sale of its property, as in cases of bridges, canals, docks, etc., the property can not be sold under execution; but there is a marked distinction between that class of corporations and those in which the public is but indirectly interested, such as mining and manufacturing, coal and iron companies, library, literary societies, schools, etc., and it is well settled that the entire property of the latter class may be sold. 60 Pa. St. 30 and cases cited; 29 Am. St. Rep. 514.

The association, being incorporated, under the statute, Kirby's Digest, § § 937-943, stands upon the same basis with other associations incorporated under this statute, with the same powers and corresponding liabilities.

2. The question of liability of the property of the association for debt of this kind is *res judicata,* that question hav-

ing been decided by the U. S. court in Thomas *v.* Library Association. Allowance of judgment against such a corporation is an adjudication of the fact that its property is liable. 109 Fed. 300.

3. The exceptions to the introduction of the petition, report and proceedings of Congress prior to issuance of patent should have been sustained. The act of Congress and the patent are plain and unambiguous, showing that the association was permitted to purchase at minimum price; but neither a trust nor a condition is attached to the grant. 191 U. S. 55; 170 U. S. 383.

4. The verdict for damages is clearly excessive.

*R. G. Davies,* for appellee.

The charity under investigation in this case falls fairly within all four of the objects cited in 10 Vesey, 532, viz.: (1) Relief of the indigent in various ways. Money, provisions, education, medical assistance, etc. (2) The advancement of learning. (3) The advancement of religion, and (4) the advancement of objects of general public utility. *Porter's Case,* 1 Coke, 24, A.

2. As to the question of *res judicata*: the doctrine of estoppel is limited to facts directly in issue, and does not extend to facts which may be in controversy, but which rest in evidence and are collateral. It must appear that the matter set up in bar was in issue in the former suit. Freeman on Judg. § 257. *Ib.* § 258. Proceedings subsequent to judgment form distinct issues of themselves. *Ib.* § 327; 174 Pa. St. 355; 131 N. Y. 80. A judgment creditor has no *jus in re.* 17 Am. & Eng. Enc. Law, 770; *Ib.* 778. See also 42 Ark. 305; 1 Black on Judg. § 424; *Ib.* § 420; Freeman on Judg. 355; *Ib.* § 356; 21 Ill. 104; 25 Ill. 221; 27 Ill. 277; 2 Freeman on Judg. § 357; 14 Ia. 400; 105 N. Y. 7; 53 Am. Dec. 701, note.

3. Authorities cited by appellants in support of their contention that the property of appellee is liable do not apply to the facts in this case, or refer to trading or other corporations which were in no proper sense public charities.

U. M. ROSE, Special Judge. (after stating the facts.) 1. We are convinced that this is a case of a charitable trust. We are referred to the decision in *Old South Society* v. *Crocker*, 119 Mass. 1; but that is not in point. In that case the court found that a trust was declared for "the beneficiaries, which were the grantees themselves and such as they should associate to themselves." The court was influenced by the further limitation in the deed "to their heirs and successors," implying "that the grantor contemplated a permanence of association of the *cestuis que trust.*" The court added: "Gifts for the erection of a house of public worship, or for the uses of the ministry, may constitute a public charity, if there is no definite body, for whose use the gift was intended, capable of receiving, holding and using it in the manner intended. To give it the character of a public charity, there must appear to be some benefit to be conferred upon, or duty · to be performed towards, either the public at large, or some part thereof, or an indefinite class of persons." Page 22.

In this case one of the objects of the association is to "organize a reading-room and library for our own benefit, and that of the multitude of people who visit our city in search of health and pleasure." This clause does designate an indefinite class of persons. It is plain enough that the phrase "for our own benefit" is not to be understood as confined to the persons who signed the petition for a charter, but was intended to embrace all persons who should thereafter contribute to the support of the library by becoming members of the association. This was also an indefinite class of persons. It certainly does not change the nature of the charity that the members of the association may also enjoy the privileges of the library along with other beneficiaries. It is clear from the rules as to the admission of new members that the object is to increase the utility of the association by an appeal to the public for an extension of its influence and for its support.

The English statute of 43 Eliz., c. 4, is in force in this State. In it schools and free schools are mentioned, but not libraries. The statute was, however, only remedial and ancillary, and did not affect in any wise the jurisdiction of the chancery court as it previously existed. *Ould* v. *Washington Hospital*, 95 U. S. 303; *Biscoe* v. *Thweatt*, 74 Ark. 545.

That a free public library is a charity, there has never been any doubt. *Duggan* v. *Slocum,* 83 Fed. 244; *Pickering* v. *Shotwell,* 10 Pa. St. 23; *Cottman* v. *Grace,* 41 Hun, 345; *Fairbanks* v. *Lamson,* 99 Mass. 533; *Drury* v. *Natick,* 10 Allen, 169; *Jones* v. *Habersham,* 107 U. S. 189. The importance of a public library at a great health resort where many invalids congregate in search of health, often despondent and sad-hearted from the effects of disease, loneliness and melancholy forebodings, can not be questioned. We may suppose that of those who go there for pleasure the majority will not be indifferent to the pleasure to be derived from reading. A distinguished writer of the eighteenth century has said: "An author may be considered as a merciful substitute to the legislature. He acts, not by punishing crimes, but by preventing them."

A public library not only tends to the diffusion of knowledge, but also to public improvement in morals. The charter of the association in this case provides that demoralizing books shall not be admitted into the library; but if that clause had been omitted, the result would have been the same. This principle of selection, in ordinary public libraries, operates automatically, since men and women having children to bring up, and many other persons having the public good at heart, will not patronize or help support a library in which pernicious books form a part. It goes without saying that whatever contributes to the advance of public morals and that of civilization tends to the support of law and order and the prevention of crime.

The Library Association is organized purely for charitable purposes. It has no capital stock, no provision for making dividends or profits, and is as unselfish as any enterprise can be. *McDonald* v. *Mass. General Hospital,* 120 Mass. 432, 21 Am. R. 529. Whatever it receives from any source it holds in trust for the purposes mentioned in its charter; that is, for sustaining the library and "increasing its benefits to the public by extending or improving its accommodations and diminishing its expenses. Its funds are derived mainly from public charity. Its affairs are conducted for a great public purpose." *Id; Powers* v. *Mass. Homeopathic Hospital,* 109 Fed. 299.

By our Constitution "buildings, grounds and materials used exclusively for public charity" are exempt from taxation. Art.

16, § 5. See also Kirby's Digest, § 6887. Further, in order to encourage institutions of that kind, and to diffuse their usefulness through all time, ample provision is made by statute for the incorporation of charities. Kirby's Digest, § 937.

By our statute cities of the first and second-class are "empowered to establish and maintain public libraries," and to levy a tax for that purpose. Kirby's Digest, § 5543.

2. It seems clear that the patent to the Library Association conveyed an estate in fee simple. To create a limitation or a condition, the intent must be clearly shown; and the mere expression of a purpose in a conveyance will not debase a fee. *Stuart* v. *Easton*, 170 U. S. 394, 399; *Wright* v. *Morgan*, 191 *Id.* 55. This question has been discussed, but we do not perceive its relevancy; for if the patent had conveyed an estate subject to a condition or limitation, there would have been an estate in the patentee until the limitation attached or the condition was enforced. A base or qualified fee during its continuance has all the incidents of a fee simple. It is descendible and assignable, and the owner, while his title continues, has the same right to the exclusive use and enjoyment of the land, and as complete dominion over it, as though he held it in fee simple. 16 Cyc. 603. Such an estate would be as liable to seizure and sale under execution as if it were a larger estate. In order to see whether the Library Association is a charitable one or not, we need not examine the patent; but we must look to its charter to discover to what uses its property is dedicated.

3. The authorities on the subject of liability of charities for the negligence of agents or employees are extremely divergent. There are at least four classes of cases:

1. Cases holding that the property of a charity can not be sold under execution. Of these we shall speak presently.

2. Cases construing charities unfavorably, and assimilating them to private corporations organized for profit, as in the cases of *Presbyterian Congregation* v. *Colt*, 2 Grant's Cases, 75, and *Davis* v. *Central Congregational Society*, 129 Mass. 372.

3. Cases holding that trustees of a charity, though not answerable for the negligence of its agents, are liable for want of ordinary care in their selection. This seems to be a compromise between two irreconcilable principles. Such was the

case of *Hearns* v. *Waterbury Hospital,* 66 Conn. 98.

The case of *Union Pacific Ry. Co.* v. *Artist,* 60 Fed. 365, is not in point. In that case it was held that a hospital maintained by a railroad company for the free treatment of its employees, supported partly by the monthly contributions of all its employees and partly by the company, and not maintained for profit, is a charitable institution; and that the company is not responsible for injuries caused by improper treatment by a physician or attendants employed in the hospital by the railway company by which the plaintiff, an employee of the company, was injured, where the master had exercised ordinary care in selecting such physician or attendants. Various similar cases are to be found in the books; and several are cited in *Powers* v. *Massachusetts Homeopathic Hospital,* 109 Fed. 300, 47 C. C. A. 122. They are all railway cases; and railway companies are not charitable corporations. If in any one of these cases the judgment of the trial court against the company had remained unreversed, and an execution issued upon it had been levied on the hospital buildings of the railway company, then the question now under discussion might have been presented; but such was not the case in any of them.

4. Cases holding that on a judgment against a charitable organization the grounds and buildings of the defendant can not be sold under execution, but that any of its unappropriated funds may be applied to the satisfaction of the judgment. Such was the case of *Glavin* v. *Rhode Island Hospital,* 12 R. I. 411, 34 Am. R. 675, decided on the authority of *Mersey Docks* v. *Gibbs,* 11 H. L. 686, though that was not a case of a charity, but was a suit against a public board, charged with the duty of keeping certain docks in order, for negligence in performing their public duties. As we shall see, no such suit could be sustained in this State.

The decision in the Glavin case seems also to be based on a compromise. The court said that the buildings and grounds of the hospital were "subject to so strict a dedication that it [they] could not be diverted to the payment of damages." But "funds which were applicable generally to the use of the hospital" might be so diverted. And yet it would seem plain that funds not invested in buildings and grounds would be as strictly dedicated to public uses as any other species of property. Chari-

ties must have funds on hand to meet expenses. They can not live on the wind, and that which takes away the means of living takes away life. All sums received by a charity, from whatever source, "are held upon the same trust as those which are the gifts of pure benevolence." *McDonald* v. *Massachusetts General Hospital,* 120 Mass. 435. "The donations, if any are ever made, must be used according to the terms of the gift." *Benton* v. *Boston City Hospital,* 140 Mass. 17.

We are of opinion that in this State the property of a charity can not be sold under execution issued on a judgment rendered for the nonfeasance, misfeasance, or malfeasance of its agents or trustees.

It would be difficult to overestimate the benefits that have been derived, directly and indirectly, from charities having their origin in private benevolence. Our common school system and all laws for the relief of the poor and destitute in England and in this country have had no other source. 2 Perry, Trusts, § 691. Consequently, charities are much favored in the law, and they are upheld wherever possible. *Duggan* v. *Slocum,* 83 Fed. 244; *Ould* v. *Washington Hospital,* 95 U. S. 303. The same rule was applied in the Roman law. I Domat. Title 1, § 2, XIV. And it is from that law that our doctrine of charities is largely derived. 2 Story, Eq. § 1137.

A hundred years ago Lord Eldon said: "It has been urged for the defendants, and 200 years ago it would have been urged with great effect, that no distinction ought to be made in the proceedings between a charity and an individual. But at this time it is much too late, with reference to a great many doctrines, to insist upon that; for the court does hold out relief to charities under circumstances in which it would not give relief against defendants in ordinary cases." *Atty. General* v. *Jackson,* 11 Ves. 367. So in a charity case if the bill prays the wrong relief the court will give the proper relief. *Atty. General* v. *Whiteley, Id.* 246. Thus in *Atty. General* v. *Mayor of Stamford,* 2 Swanst. 591, a bill affecting a charity was dismissed; but the court of its own motion entered a decree establishing the charity. In this respect charity cases differ from all others. *Atty. General* v. *Jeanes,* 1 Atk. 355; *Atty. General* v. *Bucknall,* 2 *Id.* 328.

Being public utilities of a very high order, charities are

intimately associated with the State, which exercises over them through its courts a watchful supervision, so that their property, funds and revenues shall not be diverted to any improper purpose, and that trustees and agents shall perform the duties assigned to them with honesty and fidelity, and for the best advantage of the charitable uses designated by the donor or donors. For these ends the chancery courts have an original and an inherent jurisdiction. *Vidal* v. *Girard*, 2 How. 195. If the estate is misapplied, the remedy is not forfeiture, but a suit to enforce a trust. *Brown* v. *Meeting Street Baptist Society*, 9 R. I. 186. It is the duty of the courts to correct all abuses in the management of the trust, and to preserve the property. *Stanley* v. *Colt*, 5 Wall. 169. The trustees can always be required to account for the distribution of the funds, and they can be dealt with by the court for any bad faith or breach of the trust. 2 Perry, Trusts, § 712, 719. If a donor makes a gift for a particular charity, and appoints no trustee, the charity will not fail; for the court will appoint a trustee. *Reeve* v. *Atty. General*, 3 Hare, 191. So, if the devise is to a corporation not yet in existence, it will pass to one that may be afterward organized. *Inglis* v. *Trustees*, 3 Pet. 99. Devises for charitable purposes that are void at law are often sustained in chancery. 2 Story, Eq. § 1170. Where a literal execution of a charitable devise becomes inexpedient or impracticable, the court will execute it as nearly as it can according to the original purpose. *Id.* § 1169. The court will supply all defects of conveyances where the donor has capacity to convey unless the mode of donation contravenes some statutory provision. *Id.* § 1171.

The chancery court has jurisdiction over the trustees of charities, as it has over all trustees, to see that they do not commit a breach of their trust, or apply the fund in bad faith, or to purposes that are not charitable. 2 Perry, Trusts, § 719. So intimate is the connection between the State and organized charities that it is the duty of the Attorney General to intervene in all cases where there is a violation of duty by the trustees that endangers or impairs the charity. *Id.* § 744. And in such cases strict rules of practice can not be insisted upon. *Id.* A public charity is not within the rule as to perpetuities. *Biscoe* v. *Thweatt*, 74 Ark. 546.

The doctrine of liability of the principal for the acts of his agent performed within the scope of his authority, as expressed in the maximum *respondeat superior,* is not of universal application. It does not apply either to the State or the Federal government. *Belknap* v. *Schild,* 161 U. S. 17; Broom, Leg. Max. p. 865.

With us a municipal corporation is not liable in a civil action to one who is injured by reason of a defective street, although the statute requires that the municipality shall keep the streets in good repair. *Arkadelphia* v. *Windham,* 49 Ark. 139; *Ft. Smith* v. *York,* 52 *Id.* 84. The same rule applies to counties. *Granger* v. *Pulaski County,* 26 *Id.* 37. So of school districts and other *quasi* public corporations. *School District* v. *Williams,* 38 *Id.* 454; *Collier* v. *Ft. Smith,* 73 Ark. 447.

The reason given for the exemption of the property of cities, counties and other public corporations from sale under execution is that they are public agencies of the State. The State itself is merely a trustee for the public good. It has no other excuse for being. Counties, towns, school districts and similar public bodies, being a part of the machinery of the State government, hold their property of whatever kind subject to the same trusts, so that it can not be diverted to individual uses, the whole object of the government being to confer the greatest good on the greatest number.

In this work charities are important helpers and co-workers, relieving the State of a large part of its burdens. In every community there are schools, colleges, hospitals and churches that are fruitful in good works that could not be performed by the State with the aid of any number of policemen or that of a standing army. In their several ways charities are more efficient in promoting the public good than the State could be acting without their aid. Whatever privileges or exemptions may be granted to such charities by the State are not gratuities; for without schools, hospitals, churches and libraries we should soon relapse into a state of semi-barbarism, which would not be for the public good.

The immunity of the property of a charity from sale under execution rests on special grounds. The property of a corporation organized solely for charitable purposes is exclusively dedi-

79—36

cated to public uses, as much so as the streets and alleys of a town or city; for this purpose the corporation is a mere trustee. *Benton* v. *Boston City Hospital,* 140 Mass. 13, 18. It is of primary importance to the public that the trust shall be perpetuated. The trustees of the corporation are usually unsalaried agents, devoting their time and labor to the use and benefit of the public. For their own wrongs and misdeeds they are personally answerable, just as are the physician and the attendants in a hospital. If the doctrine of *respondeat superior* is applied to them, it follows that, along with their other powers, they possess an implied power to destroy, by a willful violation of their duties, by collusion, or by negligence, the public interests that they are selected to preserve. Any conclusion that tends to support that view must leave out of consideration the public; that is to say, the party most deeply interested. To say that the trustees may by their negligence destroy the charity is simply to say that they may do indirectly and by inadvertence what they can not do directly. The doctrine that the principle of *respondeat superior* has no application in this class of cases when the trustees willfully abuse their authority, and that it does apply in a single species of negligence, would seem to be merely the result of another effort to find a compromise. Nor do we think that an illogical compromise of that sort would tend to the public advantage. A judge or a jury might be convinced, after a case of negligence had occurred, that due judgment and discretion had not been used in the selection of experts and other agents, when perhaps they themselves, if put to it in a similar case, would do no better, and might do worse; and it seems to us that if our schools, churches, hospitals, and other charities could be sold out on such vague matters of opinion, about which men would naturally differ, the result would be extremely unfortunate. In *Fire Ins. Patrol* v. *Boyd,* 120 Pa. St. 624, 6 Am. St. 745, the court, as to this question, decided that the charity was not liable, saying:

"It would be carrying the doctrine of *respondeat superior* to an unreasonable and dangerous length. That doctrine is, at best, as I once before observed, a hard rule. I trust and believe it will never be extended to the sweeping away of public charities; to the misapplication of funds, specially contributed for a public charitable purpose, to objects not contemplated by the donors.

I think it may be safely assumed that private trustees, having the control of money contributed for a specific charity, could not, in case of a tort committed by any one of their members, apply the funds in their hands to the payment of a judgment recovered therefor. A public charity, whether incorporated or not, is but a trustee, and is bound to apply its funds in furtherance of the charity, and not otherwise. This doctrine is hoary with antiquity, and prevails alike in this county and in England, where it originated as early as the reign of Edward V, and it was announced in the year book of that period."

This point was involved in *Heriot's Hospital* v. *Ross*, 12 Cl. & F. 507. In that case Lord Cottenham said: "It is obvious that it would be a direct violation, in all cases, of the purposes of a trust, if this could be done; for there is not any person who ever created a trust that provided for payment out of it of damages to be recovered from those who had the management of the fund. No such provision has been made here. There is a trust, and there are persons intended to manage it for the benefit of those who are to be the objects of the charity. To give damages out of a trust fund would not be to apply it to those objects which the author of the fund had in view, but would be to divert it to a completely different purpose." Lord Brougham said: "The charge is, that the governors of the hospital have illegally and improperly done the act in question; and therefore, because the trustees have violated the statute, therefore—what? not that they shall themselves pay the damages, but that the trust fund which they administer shall be made answerable for their misconduct. The finding on this point is wrong, and the decree of the court below must be reversed." Lord Campbell said: "It seems to have been thought that if charity trustees have been guilty of a breach of trust, the persons damnified thereby have a right to be indemnified out of the trust funds. This is contrary to all reason, justice and common sense. Such a perversion of the intention of the donor would lead to most inconvenient consequences. The trustees would, in that case, be indemnified against the consequences of their own misconduct, and the real object of the charity would be defeated. * * * Damages are to be paid from the pocket of the wrongdoer, not from a trust fund. A doctrine so strange as the court below has laid down in

the present case ought to have been supported by the highest authority. There is not any authority, not a single shred, here to support it. No foreign or constitutional writer can be referred to for such a purpose." In *Fire Ins. Patrol* v. *Boyd, supra,* the court said: "Not only is a trustee for a public or private use not permitted to misapply the trust funds committed to his care, but, if he convert them to his own use, the law punishes him as a thief. How much better than a thief would be the law itself, were it to apply the trust's funds, contributed for a charitable object, to pay for injuries resulting from the torts or negligence of the trustee? The latter is legally responsible for his own wrongful acts."

It is true that some of the courts have treated this case as having been overruled by that of *Mersey Docks* v. *Gibbs;* but that was not a case of a charity, but one of a public corporation supported by government funds, purely a government agency. It is true that Lord Brougham, in his remarks in the Heriot's Hospital case, speaks of charities and public corporations as if they were governed by the same rules; an error that has led to much confusion. In England the rules relating to charities and to public corporations were not the same. The case of *Mersey Docks* v. *Gibbs,* relates only to public corporations; and the decision in the Heriot's Hospital case has never been overruled. Moreover, the decision in *Mersey Docks* v. *Gibbs* has never been the law in this State; and, as we have seen, has been several times overruled by this court. With us public corporations and charities are, however, governed by the same rules as to the matter now under consideration, because the doctrine of *respondeat superior* does not apply to either.

The principle upon which the law proceeds in cases of this sort is well expressed in *Downes* v. *Harper Hospital,* 101 Mich. 559, 60 N. W. 42:

"If, in the proper execution of the trust, a trustee or an employee commits an act of negligence, he may be held responsible for his negligent act; but the law jealously guards the charitable trust fund, and does not permit it to be frittered away by the negligent acts of those employed in its execution. The trustees of this fund could not by their own direct act divert it

from the purpose for which it was given, or for which the act of the Legislature authorized the title to be vested in the defendant. It certainly follows that the fund can not be indirectly diverted by the tortious or negligent acts of the managers of the fund, or their employees, though such acts result in damage to an innocent beneficiary."

Various other cases to the same effect are cited in the opinion delivered in this cause on the former appeal.

"A valid vested estate in trust (for charitable purposes) can never lapse or become forfeited by any misconduct in the trustee, or inability in the corporation to execute it, if such existed. Charity never fails; and it is the right as well as the duty of the sovereign, by its courts and public officers, as also by the Legislature (if needed), to have the charities properly administered." *Girard* v. *Philadelphia,* 7 Wall. 15.

"With regard to the liability of charitable corporations or their trustees for the negligence of their agents or employees, there is some difference of opinion, but the decided weight of authority denies such liability; this on two grounds; first, that if this liability were admitted, the trust fund might be wholly destroyed and diverted from the purpose for which it was given, thus thwarting the donor's intent, as the result of negligence for which he was in nowise responsible; second, that since the trustees can not divert the funds by their direct act from the purposes for which they were donated, such funds can not be indirectly diverted by the tortious or negligent acts of the managers of the funds or their agents or employees." 5 Am. & Eng. Enc. Law (2 Ed.), p. 923.

4. Then the question arises whether the present suit is debarred by the judgment rendered in favor of Thomas under which the lands were sold.

If a defendant permits a judgment to go against him which he might have successfully defended, he may still claim his homestead and other exemptions. Though a judgment is rendered against a railway company, yet its franchise or other property necessary to the operation of its road can not be sold under execution, because that would interfere with the public good. *East Alabama Ry. Co.* v. *Doe,* 114 U. S. 340; 1 Freeman, Ex. § 179. The fact that a city or county is by statute liable to be sued does

not necessarily imply that its property may be taken in execution. This has been repeatedly decided. *Commissioners* v. *Martin,* 4 Mich. 557; *Waltham* v. *Kemper,* 55 Ill. 346; *White* v. *Bond County,* 58 Ill. 297; *Bussell* v. *Steuben,* 57 *Id.* 35; *Hill* v. *Boston,* 122 Mass. 352. The judgment is conclusive of the amount of the debt or demand, but it does not conclude the question as to the liability of any property to seizure under it. That is a question that may never arise. If it does arise, it will be collateral and subsequent.

The statute provides that corporations for benevolent purposes "shall have such powers of suing and being sued * * * as may be necessary to their efficient management and the promotion of their purposes." Kirby's Digest, § 943. This provision, so far from supporting the contention of the appellants, indicates with sufficient clearness that the efficient management and promotion of the purposes of the charity are to be kept steadily in view. If this were not the case, there would be no difference between charitable corporations and those organized for purposes of private gain.

But if the latter clause of the above section of the statute had been omitted, the result, in our opinion, would not be different. It is familiar law that the property of a municipal corporation is not subject to execution, although it may be sued, and in a proper case judgment may be rendered against it. "It is the settled doctrine of the law that not only the public property, but also the taxes and public revenues of such corporations can not be seized under execution against them either in the treasury or when in transit to it." 1 Dill. Mun. Corp. § 100. Neither can such property be subjected to garnishment. *Burnham* v. *Fond du Lac,* 15 Wis. 193, 82 Am. Dec. 668. The reason is that "municipal corporations are instituted by the supreme authority of the State for the public good." Dill. Mun. Corp., *supra.*

Such being the case, let us see where the doctrine of liability of the property of charitable organizations to levy and sale under execution would lead us. In every city of any considerable size may be found one or more hospitals organized and maintained by the city for charitable purposes and one or more hospitals maintained by private benevolence, under the control of trustees appointed or elected as the donors may direct or the

statute may require.   But a devise to a city for charitable pur-
poses is valid.   *McDonogh* v. *Murdoch,* 15 How, 367; *Perin* v.
*Carey,* 24 *Id.* 465.   Let us suppose then that a city had two hospi-
tals, one created and supported out of the municipal revenues
and another dependent upon a charitable gift and the donations of
private individuals, both under the control of the city as a trustee.
According to the doctrine contended for in behalf of the appel-
lants, the former could not be sold under execution because it
belonged to the city, and the latter could be thus sold because the
city was only a trustee; and this, notwithstanding both were
charities instituted "for the public good."   Such a distinction
can not be supported except by ignoring the general public in-
terests common to both of these cases.   The question is not as
to who holds the property in trust, which is merely a personal
consideration, a matter of policy and expediency; but it relates
to the objects for which all charitable uses are created, and on
account of which they are highly favored by law.   A discrimina-
tion based, not on the character of the trust, but on the character
of the trustee, would be false and misleading.

The property of a public corporation, such as a railroad or
bridge company, essential to the exercise of its corporate fran-
chise and the performance of its duties toward the public, can
not, without statutory authority, be sold to satisfy a common-
law judgment, either on execution, or in pursuance of an order
or decree of court.   *Overton Bridge Co.* v. *Means,* 33 Neb. 857,
29 Am. St. 514 and note and cases cited; *Ammant* v. *Turnpike
Road,* 13 S. & R. 210, 15 Am. Dec. 593.

Exemption laws apply to judgments rendered in favor of
the State, though the State is not mentioned in them.   *State* v.
*Williford,* 36 Ark. 155.

We need not dwell further on these matters.   Almost every
point arising in this case has been decided by this court on full
consideration.

*Grissom* v. *Hill,* 17 Ark. 483, was a much stronger case than
that now under consideration, since in that instance the property
had been sold on a judgment under the Mechanics' Lien Law in
which it was specifically described and condemned.   English,
Dig. St. p. 715, § 12.   Moreover, the Mechanics' Lien Law is
liberally construed.   *Murray* v. *Rapley,* 30 Ark. 568; *White* v.

*Chaffin,* 32 *Id.* 69; *Anderson* v. *Seamans,* 49 Ark. 478.   In ·that case there could be no doubt but that the trustees of the church had authority to erect a· building for public worship; but the court held that they had no power to charge the property of the charity with a lien that might destroy the charity itself.

The facts in the case were these:

Hill had conveyed a lot in a town to trustees for the bene-fit of a church.   The deed contained in the habendum the fol-lowing phrase:   "But said lot of land is never to be sold, or to be.used in any other way only for the use of a church, for the benefit of said Protestant Church."   The lot was afterwards sold in a proceeding instituted by Grissom to enforce a mechanics' lien for work and materials furnished for the purpose of build-ing a church on the lot, and was bought by him.   Grissom en-tered into possession, and excluded Hill and the trustees of the church.   Hill filed a bill in chancery against Grissom and the trustees, setting up the above facts, and praying that the title of the trustees be declared forfeited and revested in him, and that the title of Grissom be set aside and declared void; and it was so decreed.   Grissom alone appealed.   The clause in the deed above mentioned cut no figure in the case whatever; and what was said in the opinion as to the effect of the deed was pure surplusage, because the trustees acquiesced in the decree ren-dered in the court below and did not appeal.   This court said explicitly:

"The trustees having acquiesced in the decree of the court below, all controversy as to their rights as between them and Hill must be regarded as at an end, and the questions to be deter-mined upon this appeal arise between Grissom and Hill. * * * But whether this is technically an estate upon conditions, such as, upon failure to observe the conditions on the part of the trustees, the lot will absolutely revert to 'the donor, and thereby cut off, on account of the acts of the trustees, the beneficial interests of. the *cestuis que trust*—the denomination for whose use the trust was created—*it is not necessary to decide,* as no one is represent-ing or claiming anything for them on this appeal, unless it be ·Hill. * * * That Hill, who made the grant for the use of the church, and who was entitled to have the property appro-priated to the charitable uses of the church, had the right to apply

to equity to set aside the sale to Grissom, and divest his title and possession, there can be but little question.  On this appeal *no other question is properly presented;* and, inasmuch as the appellant has no cause of complaint, the decree must be affirmed."

The deed being, then, out of the way, the ground of the decision is clearly stated:

"If the trustees could, by improvident contracts, involve the property in debt, and thereby subject it to be sold under execution, the intention of the donor might be defeated in that way as well as by a voluntary sale on their part; because the purchaser could appropriate the lot and church in either case to his own private purposes, and prevent the use of it for religious purposes; as it seems was done in this case.  *The trustees would hardly be allowed to do indirectly that which they have no power to do directly."*

It may be said that under this ruling hard cases must occur. They will not, however, be so numerous as those arising under the law exempting towns, cities and school districts from liability for the negligence or torts of their agents committed within the scope of their authority.  On the other hand, still harder cases would occur under the opposite rule, by which the will of charitable donors would be defeated, and the public interest would be thwarted.

Very many of the greatest charities of the present day have grown from very obscure and feeble beginnings.  If they had been sold out in their infancy for some trivial sum on account of the carelessness of an agent or the mistake of a trustee, thus preventing the constantly accumulating benefits of centuries, it could not be truthfully said that the public good was promoted by the sacrifice.  Moreover, the offending agent or trustee is always personally liable for his own torts or acts of negligence.

Much of the time of our courts is rightfully taken up with the enforcement of contracts and the collection of debts; but the State, which is not exclusively a collection agency for creditors, has many other interests to look after; and the principle of *respondeat superior,* like other legal principles, has its limitations.

The decision in *Grissom* v. *Hill* was rendered just a half century ago.  It is not supported by all the authorities.  Neither is any other view of this question supported by all the authori-

ties; indeed the diversity of opinion on this subject is probably not exceeded in any branch of the law. To attempt to reconcile the adjudications would be a hopeless task. *Grissom* v. *Hill* is sustained by many of the most respectable adjudications to be found in the books, and, as we believe, by a large majority of them. We believe that the case of *Grissom* v. *Hill* was rightly decided; but, if we thought otherwise, we should think it inexpedient to reverse a rule of property so long acquiesced in. The Legislature can change the rule, if it likes; but it has shown no desire to do so. On the contrary, the tendency to foster and protect charities has become stronger. As stated in *Grissom* v. *Hill,* they were subject to taxation when that case was decided. Now they are expressly exempted by a constitutional provision. Const., art. 16, § 5. The discrimination is sharp and decisive; because the Legislature is prohibited from passing any law exempting any other property than as provided in the Constitution. *Id.* § 6.

5. As to the allowance of $200 by the court below for damages for detention of the lots, the judgment must be modified by cancelling this allowance for want of evidence to support it. Subject to this modification, the judgment is in all things affirmed.

McCULLOCH, J., dissents.