CHAMBER OF COMMERCE OF HOT SPRINGS v. BARTON.

4-4836

Opinion delivered December 20, 1937.

*C. T. Cotham* and *Paul D. Spearman,* for appellant.
*Jeff Davis* and *Charles B. Thweatt,* for appellees.

BAKER, J.   This appeal presents a voluminous record with a fairly serious task imposed in its reduction to a reasonable extent and still present what we think

are the controlling issues. The suit originated when some of the members of the Chamber of Commerce, at Hot Springs, filed a suit in the chancery court against T. H. Barton and the chamber of commerce asserting that the board of governors of the chamber of commerce had entered into a contract for and on behalf of the chamber of commerce, with T. H. Barton for the sale of radio station KTHS, located at Hot Springs, Arkansas, and operated by the chamber of commerce. Later the chamber of commerce, after a meeting of its members, authorizing such action, filed a motion asking that it be made a party plaintiff in the suit and joined in the effort to cancel the contract of sale entered into by the board of governors, for and in behalf of the chamber of commerce, as the vendor, and T. H. Barton as the purchaser. The suit proceeded to a final decree wherein contract so entered into was upheld and the chamber of commerce was ordered to deliver over the property in accordance with and under the terms and conditions of the contract. From that decree the chamber of commerce alone has appealed. We cannot conceive that it will serve any useful purpose to set forth even a summary of evidence presented upon the trial. Let it suffice to say that we have examined and considered all the evidence and we have considered that as to the facts the decree is supported by a preponderance of the evidence; or, at any rate, the decree may not be determined as contrary thereto. The main factual aspects of the case may be treated as concluded, and, therefore, become unimportant, except as the foundation of the issues is considered.

The proposition that has given us most concern is the challenge made first by some of the members of the chamber of commerce and now pursued by the appellant to the power of the board of governors to make sale and dispose of radio station KTHS, which is perhaps the most valuable, if not the sole property owned by the corporation.

This contract of sale was made and entered into by the board of governors of the chamber of commerce

without notice to the membership that the board of governors had in contemplation the prospective sale without a vote of the membership, specially authorizing such sale.

We think it hardly fair to say, as argued, that the board of governors attempted to sell or dispose of all the property of the corporation, to denude it of all physical assets and then to assume, as a corollary conclusion that the chamber of commerce no longer having cause for its continued existence should be dissolved. Preparatory to a discussion of the particular power of the board of governors to enter into this contract of sale the purpose of the corporation may be stated by quoting from its constitution as follows:

"This chamber is organized, not for pecuniary profits, but to unite the property owners, hotel and bathhouse interests, merchants, professional men, and citizens generally for the following purposes: To promote the interests of the city of Hot Springs in every avenue of trade and commerce; to oppose discrimination against such interest by any corporation, organization or association; to guard against and oppose national, state, or municipal legislation inimical to the city and its institutions; to co-operate with the railway companies; to secure and maintain favorable freight and passenger rates and the best possible train service from all directions; to entertain distinguished and other visitors, associations, commercial bodies, etc., and to direct their attention to points of interest; to encourage the holding of conventions and similar gatherings in this city; to stimulate and answer inquiries either from those in quest of health or pleasure or from corporations or individuals contemplating a change of location; to foster manufacturing and commercial enterprises of every character; to encourage by all legitimate means, the development of the wonderful natural and agricultural resources of the vicinity and to keep the marvelous qualities of our health restoring hot waters, the unrivaled perfection of our climate, and the superlative advantages of our surroundings as the World's Great-

est Health and Pleasure Resort, constantly before the public of this and other countries, thereby securing the greatest possible good for the greatest number of people.''

As organized for the purposes above, the corporation operated for many years. Finally the Arlington Hotel at Hot Springs, which had built the original broadcasting station, operating as KTHS, proposed to donate the broadcasting station to the chamber of commerce, which it might use as part of its system or scheme for advertising Hot Springs as a popular resort. There is some dispute about the terms under which the broadcasting station passed to the chamber of commerce, but we think it may be determined from the evidence and circumstances in proof that the chamber of commerce took over this new enterprise under an agreement, not in writing, that it should operate the plant for a period of at least three years after which the sale might be made thereof, and, in the event of sale, $25,000 of the purchase price should then be paid to the Arlington Hotel to reimburse it for its original investment. It is urged that evidence to this effect is not proper, because it is not embraced or included in the minutes of the chamber of commerce. We do not think that this omission from the minutes is conclusive of the facts for the reason that the chamber of commerce has no more right or power than an individual would have to insist its own self-serving report is true and so prevent a production of other evidence not in writing.

Many years have elapsed since that time, and conditions have within recent years been such that profits have been somewhat curtailed and those in charge and having the responsibility for the operation of the broadcasting station, no doubt, have become somewhat concerned as to the propriety of the future maintenance and operation of the station. This conclusion is not stated as adding anything to the power of this board of governors to make the sale, but as indicating that there are reasons, no doubt, sufficient in themselves to the board of governors impelling or warranting the

action taken. We have no doubt the deal was one to dispose of what had become to them the proverbial "white elephant."

It is conceded by the appellant that this action of the board of governors was without fraud. In truth, there is no evidence of fraud. There is evidence, however, that their proceedings in entering into the contract and the amendments thereto were enacted under a certain degree of secrecy, but we think the explanations offered for whatever concealment there was of their proceedings are reasonable, and more particularly so in view of the frank concession that no fraud motivated the conduct of the parties.

Evidence is offered that the chamber of commerce has collected large sums of money, perhaps more than $400,000 as dues from its members and among those who made these contributions was the Arlington Hotel which was paying $4,000 a year at the time it delivered this station to the chamber of commerce. It agreed to double, or increase its payment to $8,000 a year for the next three years after the chamber of commerce accepted the radio station, during which time there was to be no sale. These statements bear no earmarks of fabrication, but appear as a relation of connected current events of the period considered.

We think it may be fairly urged that the purposes of the organization were set forth in its constitution; that it accepted the dues and contributions of its members for said purposes, it was not organized or supported exclusively for the maintenance of a radio station, but that such radio station, while operated, was merely one of the incidents or instrumentalities employed by it for the dissemination of its advertising and campaign matters.

The board of governors relied upon a writing, identified as by-law No. 1 of art. 3, for the power it has exercised in entering into this contract, as follows:

"The Board of Governors shall exercise the general powers of the corporation, and shall have authority to employ agents, and such employees as may be neces-

sary from time to time to carry on the work of the chamber, to fix salaries and make contracts, and generally to direct the affairs of the chamber. The officers of the chamber shall be the custodians of its property."

The so-called by-law is as a grant to the board of governors of all the power possessed by the corporation itself and needs no interpretation in that respect. Can that power and authority be granted by a permanent general writing such as the quoted paragraph above?

It is urged that this so-called by-law above quoted is not supported in legal theory as authority to dispose of property owned by the corporation. It should have been regarded as ineffectual and that if the board of governors desired to make sale of the property, a meeting should have been called of the membership of the chamber of commerce and the question should have been submitted to it at such meeting by submitting to a vote some proper resolution authorizing such sale and transfer. Since that was not done appellants insist the contract is not binding upon its members.

We think there are several fallacies in this contention, and the first is that all the members could do at this time would be to pass a resolution just as the members did at some former meeting when they adopted the disputed writing. It is not contended that it was not properly passed or that it was not in full force and effect. Nor is it contended that by nonuser or failure to exercise the powers therein given that it is no longer in effect. The truth is, as we understand the record, the entire business of the chamber of commerce is now and has been controlled by virtue of that grant of power; that whatever meetings were had were infrequent, and perhaps there were generally only the annual meetings for the election of officers. The members paid their dues and thereafter the whole business of the organization was carried on, conducted and the corporation in all respects functioned through this board of governors authorized so to do by the above quoted authority. But even if we mistake as to the frequency of the meetings the rule would be the same.

It is possible that if a new resolution to the same effect and in the exact language had been offered at a meeting called to determine the propriety of selling the radio station that such resolution might not have been adopted. The only proof of this is the action taken after the contract had been duly signed. At the meeting the contract was repudiated, a suit was authorized, but it is significant no suggestion was made indicating there had at any time been recognized any limitation upon the troublemaking grant of power.

It was as much in force at the time the board of governors acted under it and by its authority as if it had been passed but the day before. It was a grant from which the board of governors derived full authority to conduct the business affairs of the corporation.

It is urged, now, that act No. 255 of the Acts of 1931 is controlling as to the point in issue. It is insisted the act was so all-embracing, so broad that it must be deemed as intended to cover even the chamber of commerce of Hot Springs, organized as a benevolent corporation, that is, it is a corporation the purposes of which are such as would have permitted its original incorporation under said act No. 255. It must, therefore, be deemed, it is contended, to have been formed under this act No. 255 for the purposes of this controversy. We do not think so. We think it is entirely beyond the realm of dispute that act No. 255 of 1931 was intended to cover business corporations only, and not intended to cover corporations such as a chamber of commerce, and organizations of that character which are formed without capital stock, which are operated not for a livelihood and not for profits, but solely as a means of enhancing or promoting the general welfare in some particular kind or class of activity.

The provisions in act 255 relative to the sale of property belonging to a business corporation provide for authority to be granted by stockholders, whose interest in the property is measured by the amount of investment that they have severally made and whose power over the property of the corporation is measured by such

investments. One having four shares having four times the voting power of another who has but one. This is a reasonable and not a mere arbitrary provision of the law because the profits of a business corporation are distributed in like manner among those entitled thereto according to the investments made.

This is not true in corporations such as the chamber of commerce whose members get together and vote for their officers. They have no stock to vote and we have never heard of a member having voting power in proportion to the amount contributed or paid in as dues. No profits are to be expected except such as may come to the community generally by reason of prospering and promoting such activities as may be engaged in by the corporation.

Appellants cite § 2196, Pope's Digest, as a limitation upon the power or authority of the board of governors to dispose of property belonging to the corporation. We have already said that the chamber of commerce has no stockholders, nor do we think it has any corresponding owners of interest in the property of the corporation. In fact, there is no way to measure any interest of a member of a benevolent association as there is in a business corporation. The stockholder may take no part whatever in the business, but that will not work a forfeiture of any property right he may hold therein. A member in a benevolent association may cease to be a member and without regard to the value of the property the benevolent association may own he would have no interest therein.

We suggest that the chamber of commerce could never have been organized under the provisions of this chapter. It could not now be converted into a business corporation. It would be necessary to organize a new corporation and then to sell and transfer assets of the old benevolent corporation to the new one. In that event, it could not reassess its capital stock annually. Certainly, it may not be urged seriously that the provisions of the law applicable to business corporations apply with equal effect to those organized under § 2252 of Pope's Digest.

This section is not copied for the reason that it would unduly lengthen this opinion. Those interested, however, might read the section and other provisions for the organization, control and management of benevolent associations. In passing, we suggest that any lodge of Freemasons, Odd Fellows, Sons of Temperance, Chambers of Commerce, may be organized as corporations by following the provisions of law for the formation of benevolent associations. A cursory examination of § 2257, Pope's Digest, will exemplify the wide range of activities that may be exercised thereunder. Quoting from the last mentioned section we find this statement: "The form of government or management of such association or corporation shall be such as is prescribed by its constitution or articles of association. Such corporation and association shall have the capacity of suing and being sued and is authorized to do any and all things necessary, convenient, useful or incidental to the attainment of its purposes as fully and to the same extent as natural persons lawfully might or could do, as principals, agents, contractors, trustee or otherwise."

We find next that the chamber of commerce has empowered its board of governors as follows:

"The board of governors shall exercise the general powers of the corporation and shall have authority to employ agents, and such employees as may be necessary from time to time to carry on the work of the chamber; to fix salaries and make contracts and generally to direct the affairs of the chamber. The officers of the chamber shall be the custodian of its property."

It is not argued or even suggested that this provision of the by-laws of the chamber of commerce is not in force. In fact we take it that it is in effect agreed that the board of governors proceed and perform their duties thereunder, acting for and discharging their duties in the name and on behalf of the chamber of commerce. We know of no law and none has been cited applicable to a corporation of this character that makes ineffectual this quoted provision passed by the membership of the chamber of commerce and under which it

has continued to operate for many years. Just how long that may be is immaterial.

There is every sound reason why such rule or regulation should be upheld. As was stated in the case of *Fordyce* v. *Library Ass'n,* 79 Ark. 550, 96 S. W. 155, 7 L. R. A., N. S. 485, that the organization holds the property somewhat in the nature of the trust fund to be controlled, managed and used for the purposes of the corporation; but such possession, such custody of property, such control and management thereof must be deemed to be a practical management and control of such trust assets. *Nedry* v. *Vaile,* 109 Ark. 584, 160 S. W. 880.

In the last cited case it was held that although directors were the trustees of property a sale to a director would be voided only for fraud. Ample authorities are cited as supporting this announcement. *Horner* v. *New South Oil Mill,* 130 Ark. 551, 197 S. W. 1163; *Winer* v. *Bank of Blytheville,* 89 Ark. 435, 117 S. W. 232, 131 Am. St. Rep. 102.

We have already seen that these benevolent corporations may be such as a lodge of Freemasons or Odd Fellows and likely it would be extremely impracticable, if not impossible to call a lodge together, embracing a membership probably of a whole state, in order to have authority to sell a piece of real estate worth perhaps only a few hundred dollars. The futility of the enforcement of such a rule as is now contended for by appellant must be apparent. Even if the board of governors be regarded as trustees, so long as the trustees act within the power and in good faith such proceedings as may be had on behalf of the corporation will bind it. It must act, if at all, by its officers.

If it could pass a resolution by its members authorizing such sale and thereby grant the power, it has already done that in the adoption of the quoted authority to the same effect.

It is also argued, most seriously, that an affirmance of this case by this court amounts to an effort on the part of the chancery court of Garland county, as approved by the highest tribunal of the state, to interfere

with or control the action of the Federal Communications Commission and since that commission has occupied the particular field and has within its jurisdiction sole power to determine to whom it shall issue licenses that no issue remains for judicial determination. We do not think so. There are questions of rights arising out of the contract made by the board of governors, representing the chamber of commerce, with T. H. Barton, which have properly become the subject of litigation and are presented for determination. We have nothing to do with the question of the suitability or eligibility of a licensee of the Federal Communications Commission, but under the terms of the contract therein entered into, upon such conditions as we are convinced this one is, the jurisdiction of the courts have been properly invoked to determine if T. H. Barton and Radio Enterprises had a legal contract with the chamber of commerce. The truth is, the chamber of commerce, by making itself a party plaintiff in the chancery court, has invoked its jurisdiction for that very purpose and it may not now be permitted to plead the futility of its conduct in that respect.

There is much testimony in this record offered as tending to show a sufficient reason whereby the board of governors entered into the contract for the sale of broadcasting station KTHS. We think a preponderance of the testimony justifies the conclusion of the board of governors that a sale was proper.

Since we disclaim the right and intention to invade the realm occupied by the Federal Communications Commission most of the interesting authorities cited for our consideration are not available or pertinent. Furthermore, the principal issue remaining being that of power granted to the board of governors and one having been determined by the laws relative to benevolent corporations, there remains little to be said in regard to the law.

Specific performance may be decreed for sale and delivery of personal property under proper conditions warranting such order. 5 Pomeroy (2d Ed.), § 2170.

A judgment for a bit of lumber from which a picture frame might be made and also for a small lot of tube paint and a yard of canvas would not compensate one who had purchased a great painting.

By the same token Barton would not be adequately compensated by a judgment for a bit of wire, a steel tower or two, more or less, as the mere instrumentalities of KTHS when he has purchased an organized business, including these instrumentalities, worth perhaps not more than one-third of the purchase price. Moreover, he has also contracted for the good will of KTHS which is so intangible as to be incapable of delivery or estimation of value. So the property is unique in character and so far as the contract is capable of enforcement the vendee is entitled to relief. At least, he may be aided to the extent that the vendor may be restrained to the extent that no affirmative act or influence may be exerted to hinder, or prevent the performance of the contract.

There is no error.

Affirmed.

SMITH and MEHAFFY, JJ., dissent.