FRANK LLOYD WRIGHT FOUNDATION, Appellant, vs. TOWN OF WYOMING and others, Respondents.

*September 7—November 9, 1954.*

600

For the appellant there was a brief by *Frederic Sammond* of Milwaukee, *Randolph R. Conners* and *Frederick F. Hillyer,* both of Madison, attorneys, and *Robert L. Wright* of Washington, D. C., and *Fairchild, Foley & Sammond* of Milwaukee, of counsel, and oral argument by *Mr. Sammond, Mr. Conners,* and *Mr. Hillyer.*

For the respondents there was a brief and oral argument by *Harry A. Speich* of Mineral Point, and *Wilson H. Brue* of Dodgeville.

FAIRCHILD, C. J.   The evidence shows that the Frank Lloyd Wright Foundation was incorporated as a nonprofit

corporation in 1940 by Frank Lloyd Wright, Ogilvanna Lloyd Wright, his wife, and William Wesley Peters, their son-in-law, as an outgrowth of an earlier association formed in 1932 known as "Taliesin Fellowship." Among other things, the articles of incorporation of the Foundation state that the business and purpose of the corporation shall be:

"To encourage the fine arts by the education and teaching of the art of architecture and collateral crafts."

When Frank Lloyd Wright moved his architectural office from Chicago to the vicinity of Spring Green, he built the establishment known as Taliesin, and made it the headquarters from which he has ever since carried on his profession. Shortly after the establishment of Taliesin, Mr. Wright gathered about him certain associates and also certain young people who were interested in his work as an architect. These associates and young people carried on the work of Mr. Wright as an architect and also operated the establishment and the large farm connected therewith. Excepting for an increased volume of business, a larger farm, and an increased number of apprentices, the plaintiff corporation has been operated in the same manner since its incorporation in 1940 as in previous years. All income of Frank Lloyd Wright is turned in to the treasury, such income consisting of his fees as an architect for the "various projects he is supervising from year to year all over the world," fees from his lectures, royalties from books, all amounting to from $80,000 to $150,000 a year. After payment of "expenses" there has been a usual annual profit of from $12,000 to $40,000, for the years for which plaintiff has records, that is, for the years 1946 through 1950, except during the year 1947, when disbursements exceeded receipts in the amount of $5,400. This action was begun August 28, 1951, so that the record of receipts and disbursements for that year is not complete. The cash income from the farm, in addition to what produce

is used by the institution, is from $4,000 to $12,000 a year. Tuition from apprentices (who are arbitrarily selected by Mr. Wright) amounts to from $18,000 to $30,000 a year. If an apprentice is not able to pay all of the tuition and is considered worthy, he is admitted upon payment of such amount as he may be able to pay. The apprentices "learn by doing." All live from the funds of the Foundation, and all work of the Foundation is carried on co-operatively. Incidentally, it might be observed that on-the-job training is not a new concept. It has had long recognition in the indentured-apprentice system administered by the state industrial commission under ch. 106 of the Wisconsin statutes, without suspicion that the taxation status of the industries in which the trainees are placed is altered by their presence.

The trial court found:

"That all the work of plaintiff and Frank Lloyd Wright's work as an architect is conducted at and from the establishment at Taliesin, the apprentices and associates aiding in every way, engineering, drafting, and ultimately by becoming overseers on the various projects where structures are being created by the plaintiff and assisting in the work (menial and otherwise) of operating and maintaining the establishment at Taliesin, including the large dairy and stock farm of 800 acres connected therewith. That at the time of hearing Frank Lloyd Wright or the plaintiff was engaged in supervising the construction of about 90 buildings in 26 states."

It was further found that:

"Mr. Wright's projects as an architect are handled as follows: When a given contract has been awarded to him or to the Foundation as a project, Mr. Wright first designs the same and then it is turned over to the various associates and they and the apprentices do the actual work of preparing the plans and specifications and later supervising the construction in the various cities where buildings are being erected throughout the country. It is done just exactly as

though done by a private office conducted by Frank Lloyd Wright. . . ."

.That "The general business manager of the Frank Lloyd Wright Foundation is Frank Lloyd Wright's son-in-law who conducts most of the general business under Frank Lloyd Wright's direction."

That "No one can sign a check except Frank Lloyd Wright and he may spend the funds in such manner as he sees fit. So far as the records are concerned, there is no limit to his authority in this respect. . . ."

And that "No one testified as to what Frank Lloyd Wright, Ogilvanna Lloyd Wright, his wife, or William Wesley Peters, their son-in-law, the three directors, receive as salary, except that all expenses of every kind and description were paid. This included cars, furniture, traveling expenses, maintenance, medical and dental fees. . . ."

The claim of exemption by the taxpayer here as an educational institution or college is based on its alleged character as a benevolent, educational institution, similar to hospitals and other institutions of that nature with which they are associated in the terminology of the statute, and on the fact that its claim is governed, therefore, by the general rule providing for exemption from taxation. Any determination of the right to a tax exemption must involve a distinction between an institution given over to public welfare with only incidental benefit to the organizers and an institution where private enterprise reaps the reward with only incidental contribution to the public welfare. To meet the test of exemption of an educational institution, there must be a complete dedication to educational purposes and a divorce from gain to those who control the ownership. We have ruled that the test of whether an institution is one within the tax-exemption statute is the origin of the institution and the objects of its organizer. *Riverview Hospital v. Tomahawk*, 243 Wis. 581, 11 N. W. (2d) 188.

In *Riverview Hospital v. Tomahawk, supra,* we quoted from *Prairie du Chien Sanitarium Co. v. Prairie du Chien,* 242 Wis. 262, 7 N. W. (2d) 832, and said (243 Wis. 581, 584) : "'Under constitutional and statutory provisions granting exemption with respect to property used exclusively for charitable purposes, exemption will be granted where the charitable use is exclusive, and denied where it is not. . . . Where the charitable use is not substantial, exemption will be denied, as where charitable use is merely incidental to a principal use of another character.' 61 C. J., p. 459."

From the evidence, including the stipulation and testimony, it was found by the learned trial court in its findings of fact:

"That the main or primary purpose of Frank Lloyd Wright, Ogilvanna Lloyd Wright, his wife, and William Wesley Peters, their son-in-law, in forming the Frank Lloyd Wright Foundation, was for it to take over the large Frank Lloyd Wright architectural practice and business, as well as his large and growing farming enterprise; *that the idea of a school was merely incidental to the incorporation and formation of the Frank Lloyd Wright Foundation.*"

The primary purpose of the Frank Lloyd Wright Foundation, as found by the trial court, is therefore inconsistent with the objective of the statutory exemption of property extended to educational institutions and colleges.

The court is not bound by the statement of corporate purposes set forth in the articles of incorporation. For example, *Catholic Woman's Club v. Green Bay,* 180 Wis. 102, 105, 192 N. W. 479, states: "The corporation must not only be judged by its declared objects but also by what it actually does."

"It has been held that a corporation's declared objects are not controlling in determining whether its property is exempt, but rather the primary or actual use made of the property, that is, the activities actually carried on." 84 C. J. S., Taxation, p. 577, sec. 287 b (1).

The case of *Riverview Hospital v. Tomahawk, supra,* is directly in point here. There the purposes of the hospital corporation set forth in the articles would have qualified it for exemption as a charitable organization, but the court found that the primary purpose of the corporation was to assist the physician founding the same in the carrying on of his practice. In that case, we said (p. 584) : "The taxing authorities are not to be confined strictly to the phrases used in resolutions or to the terms within the four corners of the articles of organization or incorporation in making their investigation and determination as to the taxability of the property of a hospital. The courts will consider the close connection between donor and donee and the reserved power of control by the donor over the institution and its capability of enabling him to harvest the returns flowing from the combination of the hospital and his private practice."

From the beginning the plaintiff has not functioned as a corporation entitled to the advantage it seeks. As has been pointed out, there has been no divesting of self-interest in the control by Mr. Wright of the funds of the Foundation. He has at all times had full power over the expenditure of the proceeds for the benefit of himself and his family as he saw fit along the lines of subsistence, clothing, travel, and entertainment. The Foundation was operated entirely as though it was being conducted in the name of Frank Lloyd Wright.

Counsel for the plaintiff in their brief assert that the plaintiff corporation has the exclusive right to the architectural services of Frank Lloyd Wright and all fees for architectural services. The record, however, contains no evidence to show that Frank Lloyd Wright is bound by contract, or otherwise, to donate anything to the Foundation or that he may not discontinue his present practice at any time. If such a contract did exist, under the present setup it would be between Frank Lloyd Wright as an individual and a corporation in name, and the evidence shows that the corpo-

ration is completely dominated in every detail of its life by Frank Lloyd Wright the individual.

It is clear, then, that the Frank Lloyd Wright Foundation, as an institution does not now and never has come within the meaning of the statutes exempting the property of educational institutions from taxation, because the training of architects is only incidental to the main purpose of continuing the architectural business of Frank Lloyd Wright; nor has the Foundation at any time met the statutory requirements that it be an incorporated college in order to be tax exempt, because there has been no divesting of Mr. Wright's control of the funds or property.

As to the claim originally made under the statutes of 1947 *et ante*. Sec. 70.11 (4) of those statutes exempted all of the real estate and personal property of corporations formed solely for the purpose of encouraging the promotion of the fine arts. There is no showing that the plaintiff furnished the taxing authorities any evidence of the 10 acres or 80 acres exempt by sec. 70.11 (4) of the 1947 statutes in the case of educational institutions and colleges, respectively. Plaintiff's sole claim was that *all* of its property was exempt. It is self-evident that taxing authorities could not grant an exemption of 10 acres or 80 acres, even if the exemption were valid, until the claimant specified the acreage to be exempt. Therefore the claim of exemption for the years 1944 through 1948 must have been made under the fine-arts provision, since exemption for *all* of the land of the Foundation is claimed.

In the first place, as said above, the Foundation is not a corporation entitled to an exemption within the meaning of the statute, because Mr. Wright has never relinquished control of the funds or property.

In the second place, while architecture is a fine art, the exemption in the statutes of 1947 *et ante* of corporations formed solely to encourage the promotion of fine arts is not

applicable to an institution like the Frank Lloyd Wright Foundation which *teaches* architecture. All parts of the statute must be construed together, and where there are separate exemptions for institutions that teach, it is apparent that the legislature did not have such an institution in mind as qualifying as an institution for the promotion of fine arts. The rule of statutory construction applicable is that stated in 50 Am. Jur., Statutes, p. 371, sec. 367, as follows:

". . . where there is in the same statute a specific provision, and also a general one which in its most comprehensive sense would include matters embraced in the former, the particular provision must control, and the general provision must be taken to affect only such cases within its general language as are not within the provisions of the particular provision."

Thirdly, since it was found by the trial court that the major part of the operations of the Foundation consisted of carrying on the extensive architectural business previously conducted by Mr. Wright before the incorporation, it can hardly be said that the Foundation was formed *solely* to encourage the promotion of the fine arts.

Since Mr. Wright and his family are direct beneficiaries and the benefit to the public purely incidental, necessarily plaintiff's effort to be relieved of taxes on its property must fail because of the legal principles controlling tax exemptions, as was determined by the judgment. No grounds existing to warrant a new trial, the order denying the same was proper.

*By the Court.*—Judgment and order affirmed.

BROWN, J., took no part.