# IN RE PROCEEDINGS TO ENFORCE PAYMENT OF REAL ESTATE TAXES FOR THE YEAR 1964. STATE v. NORTH STAR RESEARCH AND DEVELOPMENT INSTITUTE.

200 N. W. 2d 410.

July 7, 1972—No. 42163.

*Faegre & Benson, Hayner N. Larson,* and *Jack D. Gage,* for appellant.

*George M. Scott,* County Attorney, and *David E. Mikkelson,* Assistant County Attorney, for respondent.

KELLY, JUSTICE.

Appeal by defendant, North Star Research and Development Institute, a nonprofit corporation, from a judgment of the Hennepin County District Court holding that defendant is not exempt from ad valorem taxes on real estate occupied and leased by it from a public school district. We reverse.

Our decision is based upon our conclusion that North Star, organized in 1963 under the Minnesota Nonprofit Corporation Act, Minn. St. c. 317, is a nonprofit corporation within the meaning of Minn. St. 317.02, subd. 5. A "nonprofit corporation" is defined there as one (a) formed for a purpose not involving pecuniary gain to its shareholders or members, and (b) paying no dividends or other pecuniary remuneration, directly or indirectly, to its shareholders or members as such. North Star has no shareholders, and there is no way in which, under its articles or bylaws or under the laws of this state, North Star could pay any dividends or other pecuniary remuneration directly or indirectly to its "members"; there is no way in which it could be said that North Star was formed for pecuniary gain to them; nor is there any evidence that its "members" received any pecuniary gain.

As pointed out in plaintiff's brief, the parties stipulated to the basic facts in this case. The evidence adduced beyond the stipulated facts is for all practical purposes uncontradicted.

North Star's genesis is found in a joint study conducted by Upper Midwest Research and Development Council (Upper Midwest) and the University of Minnesota. Upper Midwest was a nonprofit corporation organized to promote the economy of the area comprising the Ninth Federal Reserve District. The joint study was funded by a $350,000 grant from the Ford Foundation and by matching contributions of $220,000 raised by Upper Midwest and the University. The purpose of the study was "to help finance and develop a continuing economic study of the upper Midwest region." Pursuant to that goal, the study fostered a proposal for the organization of a research institute. While there are approximately a dozen nonprofit research centers located around the country, none previously existed in the area comprising the Ninth Federal Reserve District.[1] In June 1962, Upper Midwest resolved "jointly with the * * * University of Minnesota [to] take steps to incorporate * * * a research institute to be located in the Twin Cities metropolitan area."

The plans involving the research center came to the attention of certain officers of Minneapolis Area Development Corporation (MADC) in 1962. MADC, a profitmaking corporation, had been organized for the purpose of stimulating the economy by bringing new business into the area.[2] In 1956, pursuant to that goal, it had acquired from various landholders an industrial site

---

[1] There are three large research centers: Battelle Memorial Institute in Columbus, Ohio; Stanford Research Institute in Menlo Park, California; and Illinois Technology Research Institute, Chicago, Illinois. Smaller ones include Southwest Research Institute, San Antonio, Texas; Midwest Research Institute, Kansas City, Missouri; Southern Research Institute, Birmingham, Alabama; Research Triangle Institute, Durham, North Carolina; Franklin Institute, Philadelphia, Pennsylvania; Spindletop Research Inc., Lexington, Kentucky; and Gulf South Research Institute, Baton Rouge, Louisiana. The last two are substantially supported by their respective states.

[2] The impetus for MADC was the refusal of a major corporation to move to the Twin Cities area because of the lack of a large site for a plant.

in Scott County along the Minnesota River. In 1962, the site, known as Valley Industrial Park, contained approximately 2,100 acres having a cost basis of $710,063.15. By 1962, the fair market value of the industrial site was estimated by experienced appraisers to be over $5,000,000. This valuation was, however, subject to a discount to $3,534,250 if the land were to be sold to a single developer—even then, a gain in value of nearly 500 percent before taxes.

The officers of MADC believed that the proposed research center served their objective of bringing new industry into the area. The president of MADC wrote a letter to MADC shareholders wherein he proposed that they donate the industrial site, their shares and debentures of MADC, and 75 percent of their tax savings[3] to the research institute. The proposal, subsequently reduced to an agreement, provided that all shareholders except the Chicago & North Western Railway Company donate all of their stock and debentures. The railway, the largest MADC shareholder, received no tax benefit from the donation due to its lack of taxable income,[4] but nonetheless it contributed 8,312 shares and sold its remaining 1,288 shares and its MADC debentures for approximately $300,000. This made the railroad North Star's largest contributor. The contributors also agreed to pledge at least $700,000 in cash to support the initiation of the research center. Additionally, certain financial institutions made low-interest loans to the institute. Finally, several companies which

---

[3] It was estimated that corporate shareholders of MADC in the maximum tax bracket would thereby receive a 257 percent return on their investment after the contribution of 75 percent of their tax savings. The tax benefits were the same as if the securities had been given to a church. While we do not know the tax brackets of all the contributors, it is a fair assumption that, if they had not contributed their securities but had sold them, they would have received an even larger return.

[4] The railroad does, however, have a line which passes through the industrial site.

were not MADC shareholders contributed cash to the research center. MADC then dissolved.

It is important to distinguish between the contributors to and "members" of North Star. Minn. St. 317.02, subd. 5, prohibits *members and shareholders* from receiving pecuniary remuneration. The statute itself does not apply to contributors.

North Star Research and Development Institute, the object of the advantageous generosity described, was thus formed. Its articles of incorporation state that it exists "for scientific purposes in the public interest and for the public benefit." Named as incorporators were three men associated with the University, two involved with Upper Midwest, and one from the Hill Family Foundation. There were three other incorporators, all of whom were employed by private concerns: The Minneapolis Star and Tribune Company, Northwestern National Bank of Minneapolis, and First National Bank of St. Paul. The incorporators had no power over North Star of any kind.

The "members" of the corporation were originally such persons as from time to time were regents of the University of Minnesota.[5] They were to hold membership in their individual capacity. Members in a nonprofit corporation organized under Minn. St. c. 317 are the "owners" of the corporation. Although North Star has no capital stock, the members serve the same function that shareholders in a profit corporation serve. See, Minn. St. 317.22, 317.25. It is important, however, that the members of a nonprofit corporation derive no pecuniary gain from the corporation. § 317.02, subd. 5. North Star has amended its articles of incorporation to provide that the members be 12 individuals selected by the Board of Regents.

The board of directors of North Star consists of 48 to 99 in-

---

[5] The members of the Board of Regents are elected by the state legislature. Vacancies between legislative terms are filled by the governor, in which case the appointed regent serves until the next session of the legislature. University Charter, §§ 5, 6 (Terr. L. 1851, c. 3, §§ 5, 6).

dividuals elected by the "members." [6] Subsequent to February 1969, no more than two-thirds of the directors may be associated

---

[6] The original board of directors consisted of the following persons affiliated with the indicated organizations: Neal R. Amundson, University of Minnesota; Dwayne O. Andreas, Farmers Union Grain Terminal Association; Julian B. Baird, First National Bank of St. Paul; Charles H. Bell, General Mills, Inc.; Judson Bemis, Bemis Brothers Bag Company; Dean Sherwood O. Berg, University of Minnesota; H. William Blake, Northwestern National Bank of St. Paul; John R. Borchert, University of Minnesota; Herbert P. Buetow, Minnesota Mining and Manufacturing Company; Wendell T. Burns, Upper Midwest Research and Development Council; Francis E. Butler; John A. Buttrick, University of Minnesota; Edgar M. Carlson, Gustavus Adolphus College (President); Frank G. Chesley, Central Research Laboratories, Inc.; Preston E. Cloud, Jr., University of Minnesota; J. E. Corette, Montana Power Company; H. H. Corey, George A. Hormel and Company; Granger Costikyan, First Bank Stock Corporation; John Cowles, Minneapolis Star and Tribune; Dean Bryce Crawford, Jr., University of Minnesota; Richard E. Crawford, Minnesota Valley Natural Gas Company; Thomas M. Crosby, Northwest Growth Fund, Inc.; Harold J. Cummings, Minnesota Mutual Life Insurance Company; Albert H. Daggett, Gould-National Batteries, Inc.; John Daniels, Archer-Daniels-Midland Company; Raymond W. Darland, University of Minnesota; Edward W. Davis (a retired University of Minnesota professor who developed the taconite process); Donald C. Dayton, The Dayton Company; Frederick L. Deming, Federal Reserve Bank of Minneapolis; Robert Faegre, Minnesota and Ontario Paper Company; L. E. Felton, Green Giant Company; Daniel C. Gainey, Josten Manufacturing Company and regent of the University of Minnesota; Frederick R. Gamble, Montana-Dakota Utilities Company; Paul S. Gerot, The Pillsbury Company; Paul V. Grambsch, University of Minnesota; Philip B. Harris, Northwestern National Bank of Minneapolis; A. A. Heckman, Hill Family Foundation; F. Peavey Heffelfinger, F. H. Peavey and Company; Robert E. Hess, Minnesota AFL-CIO Federation of Labor and regent of the University of Minnesota; Leonid Hurwicz, University of Minnesota; A. B. Jackson, St. Paul Fire and Marine Insurance Company; E. F. Johnson, E. F. Johnson Company; A. J. Jordan, Jr., Jordan Millwork Company; David G. Kelly, Valley Motor Company; Allen S. King, Northern States Power Company; David M. Lilly, Toro Manufacturing Company; Chester C. Lind, First National Bank of Aberdeen; Goodrich Lowry, Northwest Bancor-

with private business. Thus, it is apparent that the "members" can presently insure that none of the directors be associated with business as these limitations were maximums and not a requirement. The members have elected doctors, lawyers, clergymen, educators and a prominent labor leader to the board in addition to industrial and business leaders. Neither the members nor the directors receive any compensation for their services.

If North Star is dissolved, the articles provide that all assets go to the University of Minnesota or to some other nonprofit organization described in § 501(c)(3) of the Internal Revenue Code of 1954, 26 USCA, § 501(c)(3)—that is, an organization "organized and operated exclusively for religious, charitable,

---

poration; Walter O. Lundberg, Hormel Institute; Laurence R. Lunden, University of Minnesota; Robert S. Macfarlane, Northern Pacific Railway Company; Harold Macy, University of Minnesota; C. W. Mayo, Mayo Clinic; Adrian O. McLellan, Merchants National Bank; Arthur C. Melamed, Coast-to-Coast Stores Central Organization, Inc.; John A. Moorhead, Northwestern National Bank of Minneapolis; Gerald T. Mullin, Minneapolis Gas Company; Gordon Murray, First National Bank of Minneapolis; Leonard H. Murray, Soo Line Railroad Company; John M. Musser, Weyerhaeuser Company; Will M. Myers, University of Minnesota; Philip H. Nason, First National Bank of St. Paul; Alfred O. C. Nier, University of Minnesota; William C. Norris, Control Data Corporation; Donald Nyrop, Northwest Airlines, Incorporated; Jay Phillips, Ed Phillips and Sons Company; John S. Pillsbury, Jr., Northwestern National Life Insurance Company; B. H. Ridder, Jr., St. Paul Dispatch and Pioneer Press; Paul Schilling, Waldorf Paper Products Company; James P. Shannon, College of St. Thomas; W. G. Shepherd, University of Minnesota; Otto A. Silha, Minneapolis Star and Tribune and regent of the University of Minnesota; Athelstan Spilhaus, University of Minnesota; Francis C. Sullivan, Sullivan, McMillan, Hanft & Hastings; J. Cameron Thomson, Upper Midwest Research and Development Council; W. T. S. Thorp, University of Minnesota; Maurice B. Visscher, University of Minnesota; Cecil J. Watson, University of Minnesota; Stanley J. Wenberg, University of Minnesota; P. B. Wishart, Minneapolis-Honeywell Regulator Company; R. C. Woodworth, Cargill, Incorporated; Cyrus G. Wright, Otter Tail Power Company; Willis D. Wyard, First American National Bank.

scientific" or other similar purposes, "no part of the net earnings of which inures to the benefit of any private shareholder or individual." Both the Federal and State taxing authorities have ruled that North Star is itself such an organization and that any contributions to it are deductible as "charitable contributions" under the appropriate tax laws.

North Star has also been accorded income tax exemption by both the United States and the State of Minnesota. The Federal exemption arises under § 501 of the Internal Revenue Code, 26 USCA, § 501. The state exemption is under Minn. St. 290.05(9).[7]

Voluntary dissolution of North Star must have the concurrence of three-fourths of both members and directors. It is obvious that the regents could, if they were of a mind to do so, name 12 members who could in turn elect directors all of whom might favor dissolution and the assignment of all assets to the University of Minnesota. Thus, all control over North Star has been severed from the contributors, who should be distinguished from the "members."[8]

The basic idea behind the creation of North Star was in accord with the Ford Foundation's suggestion that the area needed a research facility. It was believed that many companies were too small to support a research center of their own. North Star was intended to enable such businesses to have access to a research

---

[7] While these rulings by Federal and State taxing authorities may not be decisive of the issues in this case, the fact that Federal and State laws and administrative rulings classify institutes such as North Star as charitable organizations should have some persuasive effect.

[8] The importance and power of a member of a nonprofit corporation is illustrated by the language used by Mr. Chief Justice Dell in Minnesota Baptist Convention v. Pillsbury Academy, 246 Minn. 46, 61, 74 N. W. 2d 286, 296 (1955): "It is doubtful if any membership * * * right is any more important than the right to vote for the election of the directors * * * of a corporation who carry on and conduct the business of the corporation, elect or appoint its officers and agents, and in a large measure, determine the manner in which the corporation operates."

center, thereby stimulating the economy. The development of new products and industrial techniques was expected to have a positive effect upon the level of business activity and employment. The presence of a research center would also induce business concerns to move into the area.

The University had an additional reason to support the creation of North Star. Certain university officials were concerned about the amount of applied research as distinguished from basic research which was conducted by university faculty and students.[9] The development of North Star would fulfill the need of industry for applied research and, thereby, would relax the pressure upon the University in that area.

Since its inception in 1963, North Star has undertaken an impressive assortment of research projects for a variety of governmental, industrial, and other clients. Representative of its projects are studies for the cities of Fargo and Moorhead relating to opportunities for industrial development; development of a mathematical analysis technique used in surveys for the cities of Minneapolis and St. Paul concerning housing patterns; an investigation for the Minnesota State Department of Education relative to plans for implementing technical services made available by the Federal government; a study for the National Health Institute concerning the causes of uremia; development for the Department of Interior of a new film system for the desalination of sea water and brackish water; a project for the St. Paul School Board to assist in designing a new curriculum for the technical vocational school; and studies for the Minneapolis Planning Commission, as well as for numerous other governmental agencies. The scope of North Star's research included such commendable, disparate fields as the development of a new mem-

---

[9] Applied research is the second stage in the development of new products. The first step, basic research, is a general inquiry into the laws of nature and natural phenomenon. Applied research is the use of basic research toward the development of a specific product or process.

brane for an artificial kidney machine and formulation of a new police communications system utilizing computer technology. It also engaged in significant research, testing, and consultation services for private industry, including development of a machine that automatically records the dimensions of a client's product for purposes of quality control; facilitating establishment of a plan for production of corn sugar in western Minnesota; development of a process for conversion of waste materials from food industries into animal feed (sponsored jointly by a Federal agency and the Green Giant Company, Ralston Purina Company, General Mills, Inc., and Central Soya Company); analysis for F. H. Peavey & Company of an ultrasonic whistle for use in controlling rodents menacing its grain storage and processing facilities; a systems analysis of sales and billing procedures for the Dayton Company; analysis of sales for an industrial client with many sales outlets; and determining improved methods for the analysis of statistical data.

North Star has served the needs of government and large businesses more than was perhaps anticipated.[10] In terms of dollar volume, large companies understandably accounted for a greater volume of work than small companies. However, most of North Star's 154 industrial clients for the years 1963 to 1968 appear to have been smaller businesses. Since two-thirds of North Star's receipts for services rendered were from government projects during the period, and since 59.9 percent of its approximately 200 contracts were with industrial concerns, it may be assumed that the larger projects involved the Federal government.[11] North Star has not displayed any preference in the manner in which it has accepted clients or assessed payment for its services. All clients have been billed on the same cost-plus fee basis. Any

---

[10] The record reviews North Star's activities from 1963 to 1968.

[11] The following chart indicates the breakdown of "sponsors" (clients) for the period from 1963 to 1968, the number of sponsors closely approximating the number of contracts handled each year by North Star. However, since some of the contracts involved more than one

patents which might be forthcoming from North Star's research become the property of the client who has paid for the research and any expenses incurred in securing a patent.[12]

North Star's dollar volume of research projects and the operating gains and losses have been as follows:

| Year | Volume | Gain or Loss |
|------|--------|--------------|
| 1963 | $ 29,290 | $ (223,156) |
| 1964 | 171,798 | (273,883) |
| 1965 | 424,481 | (208,507) |
| 1966 | 747,873 | (121,730) |
| 1967 | 927,072 | ( 72,041) |
| 1968 | 1,167,491 | 48,569 |
| Totals | $3,468,005 | $ (850,748) |

Taking into account income and expenses at Valley Industrial Park, acquired by North Star as a liquidating dividend from MADC on February 11, 1965, the institute's total deficit at the end of 1968 was $943,300. Without the contributions that were made, the institute could not have succeeded.

North Star, throughout its short history, has maintained its

---

year, the total number of contracts was closer to 200. The designation of "other" includes state and local government projects.

| Year | Federal | Industrial | Other | Total | Percentage of Industrial Sponsors |
|------|---------|------------|-------|-------|------------------------------------|
| 1963 | 1 | 3 | 2 | 6 | 50 |
| 1964 | 2 | 22 | 10 | 34 | 64 |
| 1965 | 8 | 23 | 9 | 40 | 56 |
| 1966 | 13 | 33 | 12 | 58 | 56 |
| 1967 | 13 | 30 | 9 | 52 | 57 |
| 1968 | 12 | 43 | 12 | 67 | 64 |
| | 49 | 154 | 54 | 257 | 59.9 |

[12] There have been only about a half dozen patents applied for which will be assigned when and if patents are granted. North Star has applied for, and will be the owner of, one patent which was not required to be assigned.

facilities at 3100 38th Avenue South in Minneapolis. At one time the building was the John A. Johnson School, and it is still owned by Special School District No. 1 of Minneapolis. On April 9, 1963, North Star leased the property for a term of 2 years and 11 months. On February 21, 1966, a new lease was executed for a period of 2 years and 9 months. Both leases provided that, in the event the premises for any reason should become subject to ad valorem real estate taxes, North Star would pay them in addition to the rentals.[13] Taxes in the amount of $5,856.78 have been levied against the property by Hennepin County.

■ North Star makes two separate arguments concerning why it should not have to pay the tax in question. First, both North Star and the state agree that the property is owned by the public for use as a public schoolhouse. "Public schoolhouses" are exempt from taxation.[14] If the property is taxable, it must be under Minn. St. 272.01, subd. 2, which provides in part:

"When any real or personal property which for any reason is exempt from ad valorem taxes, and taxes in lieu thereof, is *leased,* loaned, or otherwise made available and used *by a private individual, association or corporation in connection with a business conducted for profit* * * * there shall be imposed a tax, for the privilege of so using or possessing such real or personal property, in the same amount and to the same extent as though the lessee or user was the owner of such property." (Italics supplied.)

This statute is amplified by Minn. St. 273.19, subd. 1:

"Property held under a lease for a term of three or more years, and not taxable under section 272.01, subdivision 2, * * *

---

[13] This provision could have been inserted because the attorney for the school board had no personal knowledge of North Star's operation, or because the legislature might have changed the law after the lease was executed, or out of an abundance of caution. It should have no bearing on the outcome of this case.

[14] Minn. St. 272.02, subd. 1(2).

when the property is school or other state lands, shall be considered, for all purposes of taxation, as the property of the person so holding the same."

Thus, the first issue is whether North Star is a "business conducted for profit." Inquiry must also be made concerning whether North Star held the property "under a lease for a term of three or more years."

The second issue is whether North Star is a "purely public charity." North Star Research argues that, because it is an "institution of purely public charity," its property is "used exclusively for any public purpose" and is exempt from taxation by virtue of Minn. Const. art. 9, § 1, and Minn. St. 272.02, subd. 1 (6, 7).

While the primary issue at the trial was whether North Star was a public charity, the issue of an exemption under Minn. St. 272.01, subd. 2, was raised and ruled upon below. In its pleadings, North Star prayed that the court adjudge that the tract was exempt from real estate taxes. Thus, the trial court pointed out:

"The dominant issue here is the matter of the exemption from paying taxes by the defendant, so if under the evidence, the defendant's claim of exemption is clearly shown, I will hold it exempt although it may be exempt under a different category than pleaded or claimed ad hoc. (Holen vs. Mpls-St. Paul Metro Airports, 250 [Minn.] 130, 84 N. W. 2d 282.) (In re: Junior Achievement of Greater Mpls. vs. State, 271 Minn. 385, 135 N. W. 2d 881.)"

The trial covered areas common to both issues, such as the absence of private gain and the accessibility of the facilities to the general public. Both issues were discussed by the parties in briefs to the trial court. The trial court ruled that the property was "not exempt from ad valorem taxation." While the trial court's conclusions of law do not specifically refer to § 272.01, subd. 2, it is evident from his memorandum that he considered

that issue. In this connection, the trial court devoted about three and a half pages under the following caption: "PUBLIC PROPERTY LEASED TO PRIVATE INDIVIDUAL OR CORPORATION CONDUCTED FOR PROFIT. SECTION 272.01 AND SECTION 273.19, M.S.A." Under this caption, the court said:

"This, in my opinion, poses the most serious question of this case. This problem has given me the most trouble—not from the standpoint of where the equity lies, but from the standpoint of interpreting the statutes as above described."

In this appeal North Star continues to pursue this question by seeking review of its claimed exemption under § 272.01, subd. 2.

If North Star Research is a "corporation in connection with a business conducted for profit," it must pay the assessed tax. Corporations properly and rightfully operated and incorporated under Minn. St. c. 317, relating to nonprofit corporations, are those corporations which are not "businesses conducted for profit." If North Star is entitled to incorporate under c. 317 and if it holds a lease of public lands for less than 3 years,[15] it is exempt from paying the assessed tax.[16]

Section 317.05 provides that nonprofit corporations may be formed for a broad number of purposes:

"A nonprofit corporation may be formed under this chapter for any lawful purpose, including, but not limited to, the following purposes: Agricultural, alleviation of emergencies, athletic, benevolent, charitable, civic, community welfare, education, eleemosynary, fraternal, general welfare, health, horticultural, labor, literary, patriotic, political, professional, recreational, religious, scientific, and social."

The writers of the chapter have declared that "[t]his section intends to be as all inclusive as possible." Committee Notes and

---

[15] See, Minn. St. 273.19, subd. 1, quoted above and discussed below.

[16] As has already been indicated, North Star Research, in fact, did incorporate under Minn. St. c. 317.

Comments, 20A M. S. A. p. 324. Obviously, a nonprofit corporation need not be formed for purely charitable purposes.[17]

The legislature has specifically provided that a nonprofit corporation may have purposes which directly benefit the business community:

"A corporation may be formed under this chapter [c. 317, entitled the Minnesota Nonprofit Corporation Act] to:
"(1) acquire and disseminate useful business information;
"(2) inculcate equitable principles of trade;
"(3) establish, maintain, and enforce uniformity in the commercial usages, business transactions, and trade relations in the municipality in which it is located." Minn. St. 317.64, subd. 1.

Thus, the fact that the business community utilized and benefited from North Star's research facilities will not, in itself, deprive North Star of its nonprofit status.[18]

It is necessary to determine first of all whether North Star in reality has operated as a nonprofit corporation or whether it has in fact been a "business conducted for profit." The legislature no doubt intended by the phrase "business conducted for profit" to exclude nonprofit corporations formed under Minn. St. c. 317 and operating within the requirements of that law.

The legislature has clearly set forth the relevant criteria for nonprofit coporations. Minn. St. 317.02, subd. 5, provides:

" 'Nonprofit corporation' means a corporation (a) formed for a purpose not involving pecuniary gain to its shareholders or *members* and (b) paying no dividends or other pecuniary re-

---

[17] Social organizations are examples of corporations which are nonprofit but are not charitable.

[18] See, Chamber of Commerce of Hot Springs v. Barton, 195 Ark. 274, 112 S. W. 2d 619 (1937) (chamber of commerce held nonprofit); Burley Tobacco Growers Co-op. Assn. v. Rogers, 88 Ind. App. 469, 150 N. E. 384 (1926) (marketing association held nonprofit); Snyder v. The Chamber of Commerce, 53 Ohio St. 1, 41 N. E. 33 (1895) (chamber of commerce held nonprofit).

muneration, directly or indirectly, to its shareholders or members as such." (Italics supplied.)

The test is whether or not the "members" received any "dividends or other pecuniary remuneration."[19] Thus, the making of a profit by the corporation is of no consequence, it being essential that shareholders or members receive no profit. A Wisconsin decision aptly describes the test:

"The fact that [taxpayer's] income exceeds its disbursements does not necessarily destroy its nonprofit character. Whether dividends or other pecuniary benefits are contemplated to be paid to its members is generally the test to be applied to determine whether a given corporation is organized for profit." Associated Hospital Service, Inc. v. City of Milwaukee, 13 Wis. 2d 447, 466, 109 N. W. 2d 271, 280 (1961).[20]

If the evidence here disclosed that the "members" had received any "pecuniary gain" from the activities of North Star, then, in spite of its declared objectives, we would have to hold that in reality it was not a nonprofit corporation as envisioned by our statutes. There is no evidence nor even suggestion that the "members" who have been elected by the Board of Regents have acted as "fronts" for the contributors or have in any manner not acted in good faith.

Although North Star has carried on its activities within the limitations prescribed by our Nonprofit Corporation Act, the trial court would hold nonetheless that it was conducting a business for profit. In this connection that court in its memorandum stated:

"In the business world profit means the difference between

---

[19] Sheren v. Mendenhall, 23 Minn. 92 (1876); State ex rel. Russell v. Sweeney, 153 Ohio St. 66, 91 N. E. 2d 13 (1950).

[20] See, also, In re Validity of Claim of Assembly Homes, Inc. v. Yellow Medicine County, 273 Minn. 197, 140 N. W. 2d 336 (1966); State ex rel. Johnson v. Lally, 59 Wash. 2d 849, 370 P. 2d 971 (1962); Voeltzke v. Kenosha Memorial Hospital, Inc. 45 Wis. 2d 271, 172 N. W. 2d 673 (1969).

material sold and the expense or overhead expense of selling the product, but generally the term means 'to reap an advantage, financial or otherwise.' There are many instances where the same stockholders own other companies that give supplemental services to the other corporation. They may operate at a loss, but for many reasons the owner is of the opinion that the loss is justified because of the benefit to the other business. It would be an easy matter to evade the purpose of this statute by having such an arrangement. It is my opinion, therefore, that the legislature had in mind and it was their intent, when they used the words 'operated at a profit', they meant the general term 'to reap an advantage financial or otherwise.' "

If this definition of "profit" is to be applied to the phrase "in connection with a business conducted for a profit," obviously the word "profit" is being taken out of context. Furthermore, almost any use by a lessee would result in some kind of advantage, i. e., social, physical, spiritual, etc. Such a nebulous definition would result in the conclusion that for all practical purposes the legislature intended no exemptions.

The possibility that it would be easy to evade the purposes of the statute by the arrangements suggested by the trial court has no application to this case for several reasons. Here, all control over the future of North Star was placed in the hands of the Board of Regents, an ever-changing body of men and women elected by the State Legislature. Under its articles, bylaws, and as it was actually operated, North Star offered its services to all, including the competitors of contributors, for the full fair and reasonable value of such services on the same basis as if such research had been conducted by any other organization.

Furthermore, the state has a procedure for controlling any violations of the statutes controlling nonprofit corporations. Thus, the attorney general may, if he finds that it is in the public interest, petition the district court requesting that the corporate affairs be liquidated and the corporate existence terminated if

the corporation has violated a provision of a statute regulating such corporations. Minn. St. 317.62.

The trial court's statement that most of North Star's incorporators were its clients is misleading. Only two of the nine incorporators were employed by profitmaking companies which were North Star's clients: Minneapolis Star and Tribune and the First National Bank of St. Paul. In the case of the First National Bank of St. Paul, the actual client was the First Bank Stock Corporation. Eighty individuals, employed by 55 entities,[21] served on North Star's original board of directors. As nearly as can be determined from the record, only about 14 profitmaking businesses of these 55 entities have ever contracted with North Star: First Bank Stock Corporation, General Mills, Inc., Bemis Brothers Bag Company, Minneapolis Star and Tribune, Minnesota Valley Natural Gas Company, Gould-National Batteries, Inc., The Dayton Company, Green Giant Company, Josten Manufacturing Company, The Pillsbury Company, F. H. Peavey and Company, St. Paul Fire and Marine Insurance Company, Minneapolis-Honeywell Regulator Company, and The Otter Tail Power Company.

While the first members of North Star were individuals serving on the Board of Regents of the University of Minnesota, the record fails to disclose the identity of subsequent members. As has been pointed out, it would be illegal for any member to receive any profit or pecuniary gain from North Star's operation, and the evidence fails to disclose any such profit or gain.

It is difficult to understand the basis for the following conclusion in the trial court's memorandum:

"Taking all of the evidence into consideration, including the background of the activities of the incorporators in the other corporations, most of whom were representatives if not officers of corporations that were served by North Star, I cannot escape the conclusion that primarily the North Star's purpose was to

---

[21] Nineteen directors were affiliated with the University of Minnesota.

serve the corporations that the incorporators represented and that the facilities of the North Star were predominantly used for that purpose.

* * * * *

"* * * [T]he dominating service is given to corporations and individual parties for profit."

Contrary to the trial court's finding, it is undisputed that most of the employers of incorporators and directors have not done business with North Star. In fact, only 15 profitmaking businesses of the 65 original contributors to North Star have contracted with it, and these 15 represent only 7 percent of its customers. Furthermore, most of North Star's contracts have been with companies and organizations which have in no way been otherwise involved with North Star. The trial court seems to attach considerable importance to the relationship between incorporators and companies who later have used the services of North Star. Incorporators of nonprofit corporations lose all their significance once the corporation is created; they no longer have any control over the corporation or its affairs. All of the basic control passes to the members (in this case the members of the Board of Regents) who become, in effect, the owners, not as individuals but as fiduciaries entrusted with the duties and powers imposed upon them by the articles of incorporation, bylaws, and state laws.

The temporary and current control of the affairs of the corporation is passed on to the board of directors, which is elected by the members. There is no showing here that any of the directors who were employees of companies doing business with North Star used their influence for the benefit of those companies. It perhaps would be better practice to avoid even the appearance of any conflict of interest by not having on the board any directors who are employees of companies contracting with North Star for research. But those directors were in the minority and the companies involved paid for the services on the same basis as the general public, so the presence of these individuals on the

board should have no bearing in this case. Furthermore, the numerous directors subsequent to the first board have actually been chosen by the members on the basis of competency and qualifications, and they are not chosen by the contributors or sponsors. By way of analogy, if a contributor to a nonprofit hospital used its facilities, would the hospital not retain its status if the contributor paid for the services on the same basis as the general public? If a "member" or "shareholder" of a nonprofit hospital used its facilities and paid the same fees as the general public, should the hospital lose its status? Similarly, if a director of a nonprofit hospital used its facilities, should the hospital lose its nonprofit status if the director paid the same fees as the general public?

The facts in this case are readily distinguishable from State ex rel. Clapp v. Critchett, 37 Minn. 13, 32 N. W. 787 (1887). There, the purpose of the corporation was to endow the future wives of members, and this court concluded that the members enjoyed a pecuniary gain. The instant case also differs from cases where a corporation has been formed to provide benefits for the members exclusively.[22]

The trial court's decision appears to have been based in part upon the mistaken belief that the shareholders of MADC, who contributed stock and cash to North Star Research, were deriving a pecuniary gain from their contacts with North Star. The fact that the corporations involved took a deduction for income tax purposes for a gift of stock which had increased in value cannot be equated with a pecuniary gain. Nor is there any pecuniary gain in having a right to obtain applied research for the same fee and on the same basis as one's competitors and the public. In this connection the trial court made the following findings:

"The Court finds that the clients engaging the services of North Star for all of the projects of research and development

---

[22] See, e. g., Clay Sewer Pipe Assn. Inc. v. Commr. of Int. Rev. 139 F. 2d 130 (3 Cir. 1943); In re Incorporation of Automatic Phonograph Owners Assn. of Pennsylvania, 45 Pa. D. & C. 551 (1942).

paid to North Star the full fair and reasonable value of such services on the same basis as if such research had been conducted by any other organization.

\* \* \* \* \*

"The Court finds that parties or members of North Star who entered into contracts with North Star for various projects of research and development paid the same rate as any others who would similarly contract with North Star and that the member parties received no special price consideration on their contracts."

In the light of these findings, it can hardly be said that the incorporators, members, or, for that matter, contributors derived any pecuniary benefits from North Star.

The record indicates that the contributors gave all control over North Star to the Board of Regents of the University of Minnesota. As members of North Star, the regents, who are elected by the state legislature, elect the board of directors. We presume that in doing so the regents would be acting in their individual capacity and not officially as the Board of Regents. The fact that several of the approximately 80 directors are employed by contributors is no indication that the contributors in any way control North Star's policies. The record is void of any such inference. Fifteen profitmaking businesses of the approximately 65 contributors have contracted with North Star: First Bank Stock Corporation, Minneapolis Star and Tribune, Minnesota Valley Natural Gas Company, The Pillsbury Company, Bemis Brothers Bag Company, General Mills, Gould-National Batteries, Inc., Green Giant Company, Minneapolis-Honeywell Regulator Company, International Business Machines Corporation, Josten Manufacturing Company, Otter Tail Power Company, St. Paul Fire and Marine Insurance Company, The Dayton Company, and Northern Natural Gas Company. The contributors were not given any special consideration by North Star. Moreover, their contracts did not constitute an inordinate proportion of North Star's contracts. Only about 7 percent of North Star's clients

were contributors. Of the approximately $3,500,000 which North Star received for services rendered, $420,000 was attributable to contracts with contributors. The contributors received only one benefit from North Star's existence—the right to purchase its services on an equal basis and at the same price as the general public, including their competitors, who were not required to contribute anything to obtain the same research.

Individuals who contribute to the establishment of a nonprofit hospital also receive a benefit. They are entitled to use the hospital's facilities along with the general public. Again, the fact that contributors to a hospital may use the hospital on the same fee basis should not deprive a hospital of its nonprofit status.

The lower court would also deny exemption to North Star on the theory that it was a corporation in "* * * connection with a business conducted for profit" as that term is used in Minn. St. 272.01, subd. 2. The court said:

"* * * It is not too far out of line to hold that the North Star was connected with many businesses that were conducted for profit. While it is true that the many large businesses were not named as incorporators, their agents and representatives were, and it was to the interest of their companies that this arrangement was made."

Incorporators as such have no powers or duties after the articles of incorporation are filed. Thus, any connections conjured up between North Star and its contributors were dissolved when North Star's articles were filed. If the lower court's nebulous construction of the word "connected" were accepted, it would for all practical purposes rule out almost every nonprofit corporation. Almost every nonprofit hospital receives contributions from banks, businesses, and professional people. No doubt the banks hope to get some business from the hospital and indirectly from its employees, and at times officers of banks and businesses may serve as trustees on hospital boards. Businesses may, and probably do, consider the advantages of being near well-equipped

hospitals for the emergency services which they make available for employees—services that may, by timely treatment to employees injured on the job, reduce an employer's cost of doing business. Should the contribution of money to a hospital or the rendering of community services by competent businessmen sitting as unpaid directors on a hospital board be considered as being done "in connection with a business conducted for profit"? Businesses may reap an advantage because, particularly in small communities, a hospital not only provides advantages by contributing to the health of the community, but it also tends to promote the economic well-being of the area. It is doubtful that the legislature contemplated any of these "advantages," contributions, or connections as a connection with a business conducted for profit. Such connections should not turn a business not conducted for a profit into a business "in connection with a business conducted for profit."

No doubt the legislature had in mind that where a nonprofit corporation is controlled by a business conducted for profit which uses such a corporation as it might an affiliate or subsidiary, the nonprofit organization should not enjoy the advantage of a tax exemption. Here the basic controls are in the Board of Regents and a board of directors of some 80 individuals representative of the entire community, including educators, clergymen, and business, professional, and labor leaders. Employees of those using the facilities of North Star are a minority on the board of directors, and there is no evidence from which it could even be inferred that their positions were used to the advantage of their employers. Thus, there are no meaningful connections.

Our dissenting brother, Mr. Justice Murphy, is disturbed by our analogy in which we use a nonprofit hospital for illustrative purposes. A nonprofit hospital was used as an example because it is a well-known type. Any nonprofit corporation could have been used for the same illustrative purposes. There is no requirement under Minn. St. 272.01, subd. 2, or Minn. St. 273.19, subd. 1, that a lessee be organized for charitable or humanitarian pur-

poses, or that the burdens of government be lessened by the tenant's operations in order to have an exemption from real estate taxes.

In summary, North Star Research and Development Institute has satisfied its burden of proving that it is entitled to an exemption under Minn. St. 272.01, subd. 2. It is a nonprofit corporation because its members receive no pecuniary gain. Its contributors derive no benefits other than those available at the same cost, not only to the general public, but to competitors of the contributors as well. It is not connected with a business for profit. Thus, § 272.01, subd. 2, and § 273.19, subd. 1, exempt the school property rented by North Star from ad valorem real estate taxes.

The record reveals that North Star leased the assessed property for terms of 2 years, 11 months, and 2 years, 9 months. There was no option to renew in either lease. North Star was apparently cognizant of Minn. St. 273.19, subd. 1, quoted above.

The trial court uses the term "evade" to characterize the purpose for the length of the two leases and the income tax savings of the contributors. Such use of that terminology fails to distinguish between "evasion" and "avoidance." The evasion of taxes generally refers to a criminal offense.[23] The legal avoidance of taxes by using statutory provisions available to all taxpayers is both legal and moral. We "avoid" but do not "evade" income taxes when we take whatever deductions to which we may be entitled. North Star had the right to conduct its activities in a manner which resulted in the least tax liability. Its attorney had the duty so to advise his client.[24]

---

[23] See, e. g., Minn. St. 290.53, subd. 4, 292.11, subd. 1, and 609.41.

[24] Canon 7, A. B. A. Code of Professional Responsibility, provides that it is a lawyer's duty zealously to represent his client. "In our government of laws and not of men, each member of our society is entitled to have his conduct judged and regulated in accordance with the law; to seek any lawful objective through legally permissible means * * *." Ethical Consideration 7-1, A. B. A. Code of Professional Responsibility.

North Star was in fact taking a risk by signing short leases. The school district could, under these circumstances, refuse to renew the lease at its termination and, in fact, as a public body would have been required to do so if offered more rent by any other possible tenant.

The trial court would interpret the plain and unambiguous clause in § 273.19, "[p]roperty held under a lease for a term of three or more years," to mean any property held for a period of three years or over under any lease. Under this interpretation the property in question could not have been assessd for taxes until the second lease was entered into because the second lease might not have been executed by the school board for any number of reasons and North Star would not have held the property for three years or over. It seems unlikely that the legislature intended such a result. In any event, we are not at liberty to construe statutory language that is precise and unambiguous. See, Graber v. Peter Lametti Const. Co. 293 Minn. 24, 197 N. W. 2d 443 (1972); Knopp v. Gutterman, 258 Minn. 33, 102 N. W. 2d 689 (1960).

■ Our decision on the first issue is dispositive of the case and there is no necessity for determining the "purely public charity" issue. Besides, it would be preferable to give the legislature an opportunity to limit or define the property of purely public charities that may have an exempt status, particularly in view of the fact that Minn. Const. art. 9, § 1, as amended November 3, 1970, specifically gives the legislature power to limit or define the property of a purely public charity to be exempted from tax. See, L. 1969, c. 925.

We unhesitatingly concede that the legislature, rather than this court, should determine the policy of this state with regard to the exemption, if any, from taxes that corporations such as North Star should be given. We urge the legislature in their judgment to limit or define these exemptions as it is empowered to do under our State Constitution. This court should not usurp

the power so recently granted the legislature by the people to decide these questions when it is unnecessary to do so.

An additional reason for our not passing upon the "purely public charity" issue is that it involves the interpretation of a constitutional provision. This court does not decide important constitutional questions unless it is necessary to do so in order to dispose of the case.[25] To express any views on the charity issue would be to indulge in an advisory opinion.

No useful purpose would be served by attempting to determine what our decision would be in the light of newspaper articles published after this case was submitted. Such items are outside the record and have no probative force. If there have been changes in the operations or control of North Star which have adversely affected its status as a taxpayer subsequent to the tax years in question, obviously, this decision will not be res judicata as to taxes in subsequent years.

In conclusion, during the tax years in question, North Star Research and Development Institute was a nonprofit corporation, operated as such, and is entitled to an exemption for those years under Minn. St. 272.01, subd. 2, and § 273.19, subd. 1, because it has held public lands under leases for terms of 3 years or less and did not enter such leases in connection with a business conducted for a profit.

Reversed.

MURPHY, JUSTICE (dissenting).

I believe the decision of the majority grants an unwarranted tax exemption to an agency engaged in a commercial enterprise. The fact that its operation is located on public property should provide it with no immunity.

North Star Research and Development Institute is a commercial agency, operating a research and testing laboratory which

---

[25] See, Minnesota Baptist Convention v. Pillsbury Academy, 246 Minn. 46, 62, 74 N. W. 2d 286, 296 (1955).

provides services not only to those who have contributed to its establishment but also to the public at large. It advertises for business just as any other commercial enterprise. Its business has grown since it was organized in 1963. In 1968, the last year involved in these proceedings, North Star's dollar volume was $1,167,491, and its profits were $48,569. We are vaguely told, however, that it serves the public weal as a nonprofit enterprise and that it bills its customers on a cost-plus basis. This cost does not include, as a part of its overhead, the item of real estate taxes. The majority opinion would hold that that item of cost of North Star's operation should be subsidized by other real estate taxpayers. The amount of the tax for the year 1965 alone is nearly $6,000. I am of the opinion that this is an unwarranted allowance of an unauthorized tax exemption, and I respectfully dissent.

The original issue, as stated in North Star's brief and litigated below, is: "Whether North Star Research and Development Institute, the appellant, is an 'institution of purely public charity' within Section 1 of Article IX of the Minnesota Constitution, and, if it is, whether real property owned by Special School District No. 1 of the City of Minneapolis and occupied by the Institute under a lease for two years and eleven months is 'public property used exclusively for any public purpose' within the same section and therefore exempt from taxation." The second issue presented is: "Alternatively, whether the Institute's use of the property is 'in connection with a business conducted for profit' so as to subject the Institute to the tax imposed for the privilege of such use by Minn. Stat. §272.01, subd. 2."

In North Star's answer in these proceedings to enforce payment of real estate taxes, it admitted occupancy under a lease since May 1, 1963, and alleged that, since that time, the real estate has "been occupied and used by the defendant solely for purposes of purely public charity." On appeal to this court, North Star has vigorously contended that it is a "purely public charity"; that its use of the property in question is for a "public pur-

pose"; and, accordingly, that it is entitled to an exemption under Minn. Const. art. 9, § 1. The majority opinion would indicate that there is some merit to the claim that North Star is a "public charity," but it does not decide the case on that issue. The majority would prefer to have the legislature define the term, "purely public charity."

This is contrary to the long line of decisions of this court applying the well-recognized definition of a purely public charity to varying situations as they have arisen. In In re Petition of Junior Achievement of Greater Minneapolis, Inc. v. State, 271 Minn. 385, 390, 135 N. W. 2d 881, 885 (1965), we said:

"The legal meaning of the word 'charity' has a broader significance than in common speech and has been expanded in numerous decisions. Charity is broadly defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons 'by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government.' "

This definition was restated in Madonna Towers v. Commr. of Taxation, 283 Minn. 111, 167 N. W. 2d 712 (1969), and expresses the general rule followed by the majority of courts. It was followed in our most recent case of State v. United Church Homes, Inc. 292 Minn. 323, 195 N. W. 2d 411 (1972).

In its presentation to this court, North Star equated its function with that of a hospital. This line of reasoning was expressed in argument by North Star's counsel as follows:

"I see no difference between going to the hospital to help me with ails of my body and going to a scientific research institute of this sort to get help with respect to other matters that may be equally important to me."

It is obvious, however, that, unlike the commercial service business conducted by North Star, "public hospitals" are exempt from taxation by the express terms of Minn. Const. art. 9, § 1. Hospitals are intended to relieve human suffering, whereas North Star owes its existence to a project which fosters commerce and assists profit-oriented enterprises in an important aspect of their business. While it may be true that North Star has done some work which may have been related to the public good, the fact is that during 1968, the last year covered by the record in these proceedings, 64 percent of its work pertained to industrial contracts. The majority's reason for evading the "purely public charity" issue escapes me. Our decisions on this point are clear and persuasive and necessarily compel a determination that no organization may clothe itself in the trappings of a nonprofit corporation, engage in a purely commercial enterprise, and escape tax liability by contending that what it does is ultimately for the public good because it might create employment and profits.

The decision of the trial judge, who has had a long experience in the area of real estate tax and has made substantial contributions to our law as evidenced in the landmark case of In re Petition of Dulton Realty, Inc. v. State, 270 Minn. 1, 132 N. W. 2d 394 (1964), is helpful. In discussing the factual background of the instant case, the trial court noted that in the beginning some of North Star's organizers sought to acquire land which might be made available to industrial plants seeking a location in this area. To accomplish this purpose, they formed Minneapolis Area Development Corporation and acquired a large tract of land in Scott County, the value of which increased tremendously thereafter. The trial court observed:

"The land in Scott County skyrocketed so it increased in value from what they paid for it, which was in the neighborhood of over $710,000.00, to a value of over $5,500,000.00. However, law of assessment holds that the reasonable market value of real estate is determined on its market value at a given date. So it was

assessed at $3,500,000.00 because there would not be a market for the entire tract and it was felt by the assessor that it would be worth $5,500,000.00 if sold in smaller parcels. This terrific accession must be accounted for in profits made for the purpose of Federal and State Incomes.

"The incorporators hit on a plan where they could donate their stock to a new corporation and thus evade this stupendous tax, keeping their original investment with a profit of over 250 percent. As their companies showed large profits, this could be taken off as a loss. However, the railroad was operating at a loss, so this would not be advantageous to it. There were others in the corporations that were likewise situated, so they were bought out.

"They could then establish a research company with a basic capital of at least $3,500,000 as assets in the form of this land. They also found a need for such a research company. Some of the companies had a research department of their own but found they were not equipped to carry out a research on some of their special work, while other companies who did not have a research department would have had to have the researching done by out-state companies. This, therefore, was a valuable addition to their venture. They were safe in the question of patents, as under their contract with the North Star they were protected. They paid the same in the nature of donations rather than payment for services rendered.

"North Star showed a loss in operations, in my opinion, because they were getting no income from the land assets that if liquidated would have at least brought in over $150,000.00 per annum. Donations are not considered earnings, so I suppose the donations received on contracts were carried on the books as capital.

"There was not sufficient business in only taking care of their members, so they advertised for other work, sending out at one time 2,500 brochures showing what they were capable of doing.

They did research work for the cities, the counties, the State, and the Federal Government. There was not a scintilla of evidence offered showing what was paid to them for this service. It can be inferred that they were paid a reasonable value for this service.

"They did some work on experiments made by the University as to the heart and kidneys. It is common knowledge that grants are given to the professor making such experiments, so isn't it reasonable to assume in the absence of testimony that they were paid for this as well?"

The trial judge correctly noted that, according to common practice and understanding, charity means "that which is given to relieve the needy, any act of help to the needy; almsgiving." The trial court noted that no one in the factual picture before him was poor or impoverished in the broader sense of the term. Citing In re Petition of Junior Achievement of Greater Minneapolis, Inc. v. State, *supra*, he characterized charity as—

"* * * a gift to be applied consistently with existing laws for the benefit of an indefinite number of persons by providing relief in the form of education or religion, alleviation from physical pain, assistance in life, public buildings or works, or other relief to lessen the burden of government."

The trial court observed that the corporation falls far short of coming within this broad definition. After reviewing all of the significant authorities on the subject, he correctly observed that this case is controlled by Madonna Towers v. Commr. of Taxation, *supra*, and concluded:

"Taking all of the evidence into consideration, including the background of the activities of the incorporators in the other corporations, most of whom were representatives if not officers of corporations that were served by the North Star, I cannot escape the conclusion that primarily the North Star's purpose was to serve the corporations that the incorporators represented and that the facilities of the North Star were predominantly used

for that purpose. The benefits derived were both direct and incidental—incidental in like manner as a chamber of commerce would serve the economic needs by making the territory serviceable to other corporations that might be interested in establishing their business in this region; directly in that some business, which was unable to maintain a **research department because** of their size and in giving service to large corporations whose research departments were not equipped to carry out special researches. It is quite true that these representatives of business established this research center partly in loyalty to the community and partly for altruistic purposes, but I cannot escape the conclusion that by far the dominating purpose and activities were for the benefits of business and not of charity.

"I do not wish to convey the idea that this endeavor was entered into as a gimmick to evade paying an ad valorem tax, and to evade the payment of a large Federal and State Income tax and to provide credits on profits made in their main endeavor but the results will be the same, especially in an immunity to their present location, but also later when they build and move into the Scott County property.

"This is not a small matter. The suit asks for a tax judgment of close to $6,000.00 for the year 1965. If successful, it will eliminate the payment of an ad valorem and personal property tax in the future. If the exemption was allowed, other taxpayers must pay this amount, not only for the ad valorem and property tax, but also for the services of fire and police protection and other costs not provided for by special assessments. It is for this reason something must be given in return for the loss of this income.

"It has been argued that these services furnished by the North Star are available to any of the public provided they agree to pay for them. However, it appears to me that the dominating service is given to corporations and individual parties for profit and so are given to special classes all of which are at least paid for in-

directly by the taxpayers as a whole in that they must be assessed more to fill the void created by the exemption.

"It is also suggested that the North Star's form of corporation and purposes are stated to be for charitable purposes and would qualify them as a nonprofit corporation, but, as stated before, this is not sufficient. If I may be excused from using a corny analogy—A bride dressed in white is supposed to signify purity, but it is no guarantee that she is, so a corporation organized as a charity corporation, dressed as one, does not guarantee that it is.

"If there were evidence that all of the services, or even a large part of the services rendered to governmental units were donated by the North Star; if there were evidence that the researches made by the professors of the University of Minnesota were donated by the North Star, it might be inferred that it lessened the burdens of the government in the first instance and in the second it might be inferred that this was charity because it was services donated to humanity to relieve pain and suffering but there is not a scintilla of evidence that anything was donated by the North Star.

"It is argued that the corporations were not the board of directors although its representatives were. It is hard for me to conceive a corporation being an officer or a member of the executive or other boards of the corporations. They must act through their officers and agents."

Although the case was originally tried on the issue of whether or not North Star was "a purely public charity," the trial court fully examined North Star's belated claim that it should be exempt because it was not "a business conducted for profit" within the meaning of Minn. St. 272.01, subd. 2. Had this issue been properly litigated in the court below, we might have a meaningful record. In any event, the trial court's memorandum states:

"The case was tried on the theory that the defendant was entitled to have an exemption upon the grounds that it was an in-

stitution of purely public charity (pleaded), and upon the statement made by the defendant's attorney that the subject property was 'public property used exclusively for a public purpose.'

"Where a case is tried on a certain theory, regardless how erroneous that theory is, they are bound by the result unless the party cannot recover under any view of the law." [1]

It is a simple matter to identify North Star as a commercial enterprise. It operates in the same manner as any other commercial business. It has a preferred clientele and receives its business from many of the area's leading industries. Strangely, however, it asserts the right to carry on its business without the obligation to pay real estate taxes. It is difficult to understand, from an examination of the majority opinion, how such a corporation, the creature of those it serves whose motivating purpose is to produce profits, can have a tax-exempt status. The majority contends that this exemption derives from its privileged corporate character and professed altruistic purposes, which are to be found in a confused and chimerical background of real estate transactions, sophisticated Federal tax arrangements, interrelated corporate connections, as well as extravagant proposals and representations—partly fact and partly fiction.

It appears from the majority opinion that because North Star is in form a nonprofit corporation, "members" of which are the

---

[1] Annis v. Annis, 250 Minn. 256, 84 N. W. 2d 256 (1957); Newcomb v. Meiss, 263 Minn. 315, 116 N. W. 2d 593 (1962); Lohman v. Edgewater Holding Co. 227 Minn. 40, 33 N. W. 2d 842 (1948); 1B Dunnell, Dig. (3 ed.) § 404. See, also, Holen v. M. A. C. 250 Minn. 130, 84 N. W. 2d 282 (1957); Humenik v. Siwek, 266 Minn. 491, 124 N. W. 2d 191 (1963).

It may be further observed that North Star's contention that it has an exemption under Minn. Const. art. 9, § 1, because the property is "used exclusively for any public purpose," is so completely devoid of merit that it does not require discussion. It is elementary that the term "public purpose" means use for the benefit of every citizen in the community. It means a common use and not a use for particular persons or particular interests. 35 Wd. & Phr. (Perm. ed.) pp. 554 to 560.

regents of the University of Minnesota, and since the state cannot establish that these "members" have received any pecuniary gain from North Star's operations, it must follow that the corporation is not connected with a business conducted for profit. Why the state should have the obligation of establishing that someone in the North Star operation gets a profit is not explained. The burden of proof to establish the right to tax exemption is North Star's. State v. Northwestern Preparatory School, 249 Minn. 552, 83 N. W. 2d 242 (1957).

It is contended the regents, who are members of an official body with responsibilities to the University of Minnesota, are also responsible for the administration of North Star. The majority opinion assures us that control of North Star "was placed in the hands of the Board of Regents, an ever-changing body of men and women elected by the State Legislature." The majority tells us that "the contributors gave all control over North Star to the Board of Regents of the University of Minnesota." The majority repeats: "Here the basic controls are in the Board of Regents and a board of directors of some 80 individuals representative of the entire community, including educators, clergymen, and business, professional and labor leaders." The majority opinion does admit that "[w]hile the first members of North Star were individuals serving on the Board of Regents of the University of Minnesota, the record fails to disclose the identity of subsequent members."

As a matter of fact, the regents have no control, nor did they ever have real control, of North Star. They were named members of the corporation for no other purpose than to give North Star the prestige of a relationship with the University of Minnesota. The Board of Regents, in the context of the case before us, was a figurehead which could serve no real purpose. As individuals, regents, if they chose, could perform the nominal or ritualistic function of appointing members of the board of directors from a list of names that we may assume was provided to them. It may be fairly stated that the relationship between the regents and

North Star was passive, ambiguous, and without official legal significance. The Board of Regents has no authority to permit a private institution to integrate with the University of Minnesota. At least no one has ventured to suggest that they have. If the members of the Board of Regents lent their names in any way to the organization of North Star, they did so individually in much the same way as other respected individuals and businesses did to endorse the general idea that the research institute could contribute to the constructive economic growth of the area. The pretense that the Board of Regents, as an official body, could commit the University to participation in the control and management of North Star is without substance.

At any rate, we may take judicial notice of the fact that whatever the nature of the relationship between North Star and the Board of Regents may have been, it has since been terminated. According to a statement by the chairman of the Board of Regents, made in January 1972, North Star's connection with the University has been severed. It is not out of place to quote from The Minneapolis Star, January 22, 1972, p. 3A, col. 1, which states in part:

"* * * [I]t was not until 1967 that frequent criticism of secret research in general and the university's tie with North Star began to be heard.

* * * * *

"At a recent meeting of the board of regents, its chairman, Elmer L. Andersen, announced that the university's remaining tie with North Star would be cut. 'Over the years the relationship has been diminishing,' Andersen said. 'No particular purpose seems to be served by continuing it.'

* * * * *

"* * * 'There was just no reason in continuing this tenuous relationship,' [Andersen] said."

The article also quotes John W. Clegg, president of North Star, as saying that, while he was not pleased with the new rela-

tionship with the university, it "should not have any great effect upon us."[2]

If it is conceded that the endorsement and approval of a large number of distinguished citizens is not sufficient to accord North Star special privilege, and if the purported ties with the University of Minnesota are correctly appraised, there is little left to give North Star the character of an institution which is entitled to a real estate tax exemption. Nevertheless, the majority falls back upon the argument, presented by defendant, which seems to be that exemption is derived from the nature of its corporate character. Great stress is laid upon North Star's character as a nonprofit corporation organized pursuant to the Minnesota Nonprofit Corporation Act, Minn. St. c. 317. The majority seems to assume that because North Star was organized under c. 317, it has acquired the immunity. Here, again, North Star fails to meet its burden of proof. There is nothing in the provisions of c. 317 to warrant such a conclusion. If exemption exists, it must come from the constitution or statutes. The declared objects of a corporation are not controlling in determining whether or not its property is exempt. It is well established that exemption is determined by the activities actually carried on by the corporation. Frank Lloyd Wright Foundation v. Town of Wyoming, 267 Wis. 599, 66 N. W. 2d 642 (1954); 84 C. J. S., Taxation, § 282b (1). In the case of the Experiment in International Living, Inc. v. Town of Brattleboro, 127 Vt. 41, 47, 238 A. 2d 782, 786 (1968), the Supreme Court of Vermont stated:

"The fact that Experiment has stated in its Articles of Association that it is a charitable organization, or that its income is exempt from taxation under the United States Code has no applicability to its claim that its real and personal property in Brattleboro is tax exempt as 'used for public * * * or charitable

---

[2] See, also, Minnesota Daily, January 10, 1972, p. 1, col. 1; The Minneapolis Star, January 15, 1972, p. 17A, col. 5; and The Minneapolis Star, January 22, 1972, p. 3A, col. 1.

uses.' What is determinative of such claim is the direct and immediate use of the property itself. The test is not the ownership, but the use."

The Minnesota Nonprofit Corporation Act is procedural in nature and, as stated in 20A M. S. A. 314, Committee Notes and Comments: "It is not primarily a code of substantive law." In his article in 22 Bench and Bar of Minn., Jan. 1965, p. 33, entitled *Tiptoeing Along the Non-Profit Corporation Path,* Walter N. Trenerry states:

"That pearl of great price [tax exemption] has drawn many Minnesota lawyers into the show-room of Minnesota's Non-Profit Corporation Code—where they should be grateful to find on the counter infinite entities shaped to that One Great End."

The manner in which the act's provisions may be employed to create a nonprofit corporation in the image of charity and public purpose is limited only by the resourcefulness and imagination of its incorporators. This is evidenced in the case before us by the gratuitous efforts of the incorporators to acquire the image of a public institution by association with the University of Minnesota, which would presumably identify it as having a public purpose and, at the same time, secure the advantages which might be gained from the availability of personnel and facilities of a tax-supported educational institution.

But to return to North Star's claim that it is exempt under Minn. St. 272.01, subd. 2, North Star relies on the fact that it is a nonprofit corporation to support its claim that the property it occupies is not used in connection with a business conducted for profit. Even though its work product provides the industries which support it with valuable services, including patents, formulas, labor-saving devices, and marketing and merchandising techniques and practices, and even though it provides valuable facilities for its sponsors' benefit, North Star claims, nevertheless, that it is a charitable nonprofit organization. As we have

already noted, it would have been preferable had North Star taken the trouble to develop this issue in the court below. As the trial court stated in his memorandum:

"There was no testimony as to the research that was actually made or as to the time or expense of making such research, excepting as to whom the services were rendered."

The trial court explained that the meaning of the word "profit" was not limited to the difference between returns and expenditures and observed that the term means "to reap an advantage, financial or otherwise." Webster's New International Dictionary (2 ed. 1947), p. 1976, defines it as "[a]ccession of good; valuable results; useful consequences; avail; gain; as, an office of *profit*." It may also mean "[a] saving of expense which would otherwise necessarily be incurred." State ex rel. Russell v. Sweeney, 153 Ohio St. 66, 72, 91 N. E. 2d 13, 16, 16 A. L. R. 2d 1337, 1342 (1950); 34 Wd. & Phr. (Perm. ed.) p. 404.

Whether a business is one conducted for profit is a question of fact to be determined on the basis of the record. The material findings are set forth as follows:

"The Court finds that the clients engaging the services of North Star for all of the projects of research and development paid to North Star the full fair and reasonable value of such services on the same basis as if such research had been conducted by any other organization.

"North Star also conducted research and development programs in the following areas:

"1. A project which developed an automatic recording of the dimensions of the client's packaged products.

"2. A project which resulted in a plant for the production of corn sugar in Western Minnesota, with a similar plant projected for one of the Dakotas.

"3. A project which developed the processing and conversion of waste materials from food industries into animal feed. Such project being jointly sponsored by the Water Pollution Adminis-

tration of the Federal Government and the Green Giant Company, Ralston Purina, General Mills and Central Soya, all profit-making corporations operating within the State of Minnesota.

"4. A project to develop an ultra-sonic whistle to be utilized by the Cargill Corporation [sic] for the purposes of controlling rodents which were on or about their grain storage and processing facilities.

"5. A project for the Dayton Company making a study of modern billing procedures.

"6. A project making an analysis of sales for an industrial client who had numerous sales outlets.

"7. A project involving the determination of improved methods for the analysis of statistical data.

"8. Other projects as identified by the partial list of industrial clients set forth on Defendant's Exhibit 6 as follows:

Bemis Company, Inc.
The Dayton Company
The Donaldson Company, Inc.
First Bank Stock Corporation
General Mills, Inc.
Gray Company, Inc.
Green Giant Company
Honeymead Products Company
Honeywell, Inc.
International Business Machines Corporation
Minneapolis Star and Tribune Company
Minnesota Valley Natural Gas Company
Munsingwear, Inc.
Otter Tail Power Company
The Peavey Company
The Pillsbury Company
Rosemount Engineering Company
St. Paul Fire and Marine Insurance Company
Superior Plating, Inc.

Torit Corporation

Transistor Electronics Corporation

Western Life Insurance Company

"Again, all clients paid to North Star, pursuant to contract, an agreed reasonable price for the services rendered by North Star, such price being the same as would be paid for such services performed by any research institute.

"The Court finds that the activities of North Star in no way, material to the issues in this case, lessened the burdens of government.

"The Court finds that with reference to the total volume of contracts entered into by North Star for the various research and development projects for the years 1963 through 1968, and as said contracts are broken down between government sponsors, industrial sponsors and others, such contracts and their percentages of the total are as follows:

| Year | Total Contracts | Govt. Contracts | Industrial Contracts | Other Contracts | Percentage of Industrial Contracts to Total |
|------|-----------------|-----------------|----------------------|-----------------|---------------------------------------------|
| 1963 | 6 | 1 | 3 | 2 | 50% |
| 1964 | 34 | 2 | 22 | 10 | 64% |
| 1965 | 40 | 8 | 23 | 9 | 56% |
| 1966 | 58 | 13 | 33 | 12 | 56% |
| 1967 | 52 | 13 | 30 | 9 | 57% |
| 1968 | 67 | 12 | 43 | 12 | 64% |
| Total | 257 | 49 | 154 | 54 | Average 59.9% |

"That the contracts for research and development conducted by North Star were not conducted for charitable purposes but were conducted for the benefit of the contracting sponsors of such projects and were paid for in full by such contracting sponsors, both governmental, industrial and others.

"The Court finds that parties or members of North Star who entered into contracts with North Star for various projects of research and development paid the same rate as any others who

would similarly contract with North Star and that the member parties received no special price consideration on their contracts.

\* \* \* \* \*

"North Star maintained a mailing list of 2500 companies, organizations, and governmental units and that North Star solicited for research and development contracts by mailing, advertising and other means.

"The Court finds that when North Star was involved in a contract of research or development and a patentable process, product or idea was developed as a result of such research, that in such event, the patent rights belonged to the contracting party and not to North Star and that such agreement concerning patent rights was a part of the contract between the sponsor of the project and North Star. The Court further finds that North Star agreed with its clients that it, North Star, would proceed to obtain the patent rights on behalf of the client if the client so desired, for an additional consideration paid by the client to North Star.

"The Court finds that within the general metropolitan area, the following local and industrial and commercial organizations, among others, maintained their own research and development laboratories, which in some instances, such local research labs were not equipped for a particular type of research and accordingly, such research was contracted for with North Star:

Minneapolis Honeywell
Archer-Daniels-Midland Company
Control Data
Economic Laboratories, Inc.
The Pillsbury Company
Minnesota Mining and Manufacturing Company [sic]
General Mills, Inc.

\* \* \* \* \*

"That one of the dominant purposes of North Star Research and Development Institute was to attract new industries to the

area by stimulating the economy and trade of the area and also to assist business.

"The Court finds that North Star Research and Development Institute is not an institution of purely public charity within the meaning of Article IX, Section 1, of the Constitution for the State of Minnesota or Minnesota Statutes, Section 272.02.

"The Court further finds that the property herein was not utilized as an academy, college, university or seminary of learning within the meaning of Article IX, Section 1, of the Constitution for the State of Minnesota or Minnesota Statutes, Section 272.02.

"The Court finds that the subject property of this case had been abandoned by the Minneapolis School District as a public school house for 24 years immediately preceding the date of the trial of this case and therefore is not entitled to exemption under Article IX, Section 1 of the Constitution for the State of Minnesota or Minnesota Statutes, Section 272.02, as the same had lost its identity as a public school house.

"The Court finds that the Northwestern National Bank of Minneapolis, the First National Bank of Minneapolis and the First National Bank of Saint Paul, all being directors of North Star acting by and through officers of said banking institutions, extended a line of credit to North Star in an amount of $600,000 and that North Star had utilized such credit by loans from said banking institutions to the extent of $403,000. Such loans bear interest to be paid by North Star amounting to one-half of one percent over and above the prime interest rate which is charged by the said banking institutions from time to time.

"The Court finds that the officers of North Star did not receive any direct remuneration for their services as such officers.

"The Court finds that North Star was considered by the Internal Revenue Department for the United States Government and the Income Tax Division of the Department of Taxation for the State of Minnesota as an organization exempt from the payment of income taxes, both Federal and State, and also that contribu-

tions made to North Star were eligible as contributions to a qualified charity for income tax purposes."

In State ex rel. Troy v. Lumbermen's Clinic, 186 Wash. 384, 394, 58 P. 2d 812, 816 (1936), the court, in defining the word "profit," said:

"Profit does not necessarily mean a direct return by way of dividends, interest, capital account or salaries. A saving of expense which would otherwise necessarily be incurred is also a profit to the person benefited. If respondent renders to its incorporators or members, or to businesses in which they are interested and in whose profits they share, a service at a cost lower than that which would otherwise be paid for such service, then respondent's operations result in a profit to its members."

We also have the benefit of the trial court's discussion of this issue. The court quoted the following portions of Minn. St. 272.01, subd. 2:

"When any real or personal property which for any reason is exempt from ad valorem taxes, and taxes in lieu thereof, is leased, loaned or otherwise made available and used by a private individual, association or corporation in connection with a business conducted for profit * * * there shall be imposed a tax, for the privilege of so using or possessing such real or personal property, in the same amount and to the same extent as though the lessee or user was the owner of such property."

The court went on to observe:

"This subject property is public property because it was and is owned by a unit of government. It was leased to the North Star for two years and 11 months for a consideration of $52,500.00 with a further provision if the property became subject to ad valorem real estate taxes, the lessee was to pay the sum of taxes in addition thereto.

"The question is as to whether or not this property was leased

'in connection with a business conducted for profit.' It will be noted that the statute reads 'conducted for profit' and not that the business 'was conducted at a profit.' The gist of this is not whether the corporation made a profit. It will also be noted that the statute reads 'connected with a business conducted for profit.' It is not too far out of line to hold that the North Star was connected with many businesses that were conducted for profit. While it is true that the many large businesses were not named as incorporators, their agents and representatives were, and it was to the interest of their companies that this arrangement was made.

"In the business world profit means the difference between material sold and the expense or overhead expense of selling the product, but generally the term means 'to reap an advantage, financial or otherwise.' There are many instances where the same stockholders own other companies that give supplemental services to the other corporation. They may operate at a loss, but for many reasons the owner is of the opinion that the loss is justified because of the benefit to the other business. It would be an easy matter to evade the purpose of this statute by having such an arrangement. It is my opinion, therefore, that the legislature had in mind and it was their intent, when they used the words 'operated at [conducted for] a profit', they meant the general term 'to reap an advantage financial or otherwise.' "

The majority feels as well that compliance with the literal provisions of Minn. St. 273.19, subd. 1, gives immunity to North Star. This statute merely says that when property is "held under a lease for a term of three or more years, and not taxable under section 272.01, subdivision 2, * * * [it] shall be considered, for all purposes of taxation, as the property of the person so holding the same." Even though North Star has occupied the premises for 9 years or more, the majority says it cannot be exposed to real estate tax liability because it has leased the property for consecutive terms of less than 3 years. When the state argues that the series of leases for stated terms of less than 3

years is a contrivance to avoid and evade the intent of the statute, North Star assumes an attitude of injured innocence and argues that it has done no more than it is permitted to do under the law. Here, again, as with every issue in this matter, North Star asks us to ignore the fact that it has made no attempt to meet its burden of proof, and it seems to feel that its expressed purpose and eminent endorsements are sufficient for it to prevail.

It seems to me that this is the ultimate in reliance on form over substance. Clearly, this statute was intended to permit a governmental unit to lease vacant property on a temporary basis without the necessity of encumbering the transaction with tax procedures. It was never intended to permit a lessee of government property to use and occupy it year after year, as has been done here, and to avoid the intended purpose of § 273.19, subd. 1, through the contrivance of short-term leases. This device is consistent with the legal architecture of North Star, the design of which is to structure a business operation beneath a facade which gives it the appearance of a tax-exempt institution although, in reality, it is no such thing. Here, again, the trial court has correctly appraised the situation by saying in his memorandum:

"In order to evade this provision a lease was made between the school and the North Star for a period of two years and 11 months at $1500 per month. If the North Star gave up these premises at the end of this period, it would not be subject to a tax under this provision for the reason that it did not lease the property for three years or more.

"A written lease was entered into between the School District and the North Star leasing these premises to the North Star for a period of two years and 11 months. It is unescapable that this was done under the assumption that M.S.A. 273.19 applied and that if the lease was for less than 3 years, the North Star would be exempt from paying taxes. There must have been some feeling

on the part of the school board that there might be a possibility that the Court would not go along with this theory as there was a provision in the lease that 'In the event said premises shall for any reason become subject to ad valorem real estate taxes, the lessee shall pay the amount of said taxes in addition to the rentals hereinabove provided. ['] This lease was entered into on April 9, 1963 so that said lease did not expire until March 9, 1966. On the 21st day of February, 1966, another lease was entered into between the parties on identical terms of $1,500.00 per month rental, but this lease was for two years and 10 months. I understand that before this lease expired, a third lease was entered into between the same parties under identical terms except this third lease was for two years and eight months. As a result of these three leases, the North Star has held this property as lessors for a period of over five years. What was the intention of the legislature in making the three-year provision? Was it for the purpose that public property could be leased to private individuals or corporations for a period of less than three years without being subject to pay an ad valorem tax? If, however, the property was held for three years or longer, the lessee would not be immune from paying such a tax. Was it the intent of the legislature that it would assist the public unit in procuring a renter for a short time but did not intend to continue the immunity forever providing the same tenant and the governmental unit made their leases in periods not for three years or over. It seems to me that to make sense, such was the intention of the legislature and that the statute should be construed that anyone holding the property for a period of three years or over by any lease would not be exempt. What cannot be done by direct method should not be allowed by indirect."

The majority, strangely, seems to find some support for the result it has reached by citing Canon 7, A. B. A. Code of Professional Responsibility, and explains that while North Star's conduct may have been an "avoidance" of taxes, it was not an "evasion" which could be considered legally or morally culpable.

There has been no contention that North Star did not have the right to conduct its activities in a manner which resulted in the least tax liability. The trial court made no such suggestion, nor does this writer. The trial court's position was, and this writer agrees with him, that North Star should pay its just real estate taxes and should not expect to be subsidized by other real estate property owners.

Moreover, it seems to me that the majority has failed to consider basic principles of law which should guide a court in construing statutes relating to tax exemption.

Efforts to obtain tax exemption are viewed strictly, public policy dictating that doubts be resolved in favor of the state and against the party seeking special treatment. In Camping and Education Foundation v. State, 282 Minn. 245, 250, 164 N. W. 2d 369, 372 (1969), Mr. Justice Nelson stated:

"There are certain general rules which have been long established relating to statutes and constitutional provisions providing for exemption from taxes. The basis for all tax exemption is the accomplishment of some public purpose as opposed to favoring of particular persons or corporations at the expense of the taxpayers generally. State v. Board of Foreign Missions of Augustana Synod, 221 Minn. 536, 22 N. W. (2d) 642. Accord, State v. Ritschel, 220 Minn. 578, 20 N. W. (2d) 673, 168 A. L. R. 274; State v. Northwestern Preparatory School, 249 Minn. 552, 83 N. W. (2d) 242; State v. Northwestern Vocational Institute, Inc. 232 Minn. 377, 45 N. W. (2d) 653.

"One of the rules that is well established is that taxation is the rule and exemption is an exception in derogation of equal rights. Therefore, there is a presumption that all property is taxable. In consequence, the burden of proof is on the one seeking the exemption to establish that he is entitled to the exemption. See, In re Junior Achievement of Greater Minneapolis, Inc. 271 Minn. 385, 135 N. W. (2d) 881; Christian Business Men's Committee

v. State, 228 Minn. 549, 38 N. W. (2d) 803; American Ry. Exp. Co. v. Holm, 169 Minn. 323, 211 N. W. 467.

"Another long-established rule is that exemption provisions are to be strictly construed. See, Ramaley v. City of St. Paul, 226 Minn. 406, 33 N. W. (2d) 19. See, also, St. Peter's Church v. County of Scott, 12 Minn. 280 (395); County of Hennepin v. Bell, 43 Minn. 344, 45 N. W. 615; County of Ramsey v. Church of the Good Shepherd, 45 Minn. 229, 47 N. W. 783, 11 A. L. R. 175."

The trial court correctly saw the transparent character of North Star. The realities of this case establish that North Star is actually an agent and arm of its sponsors, who derive the benefits of its activities in the form of reduced capital cost and increased competitive position through improved access to research and development resources. These benefits, which conclusively establish use of the property in connection with a business conducted for profit, as well as other reasons herein discussed, should require affirmance.

For the foregoing reasons, I respectfully dissent.

KNUTSON, CHIEF JUSTICE (dissenting).

I agree with the conclusion reached by the dissent of Mr. Justice Murphy. I have no difficulty in concluding that this institute is not a purely public charity. I find more difficulty in holding that the institute does not come within the provisions of Minn. St. 273.19, subd. 1, but I am persuaded that the dissent is correct on this issue also. Obviously, the statute was intended to permit short-term leases of public property to avoid payment of taxes. But when the lease is made, as was done here, for 2 years 11 months, with subsequent leases being made of similar duration, it seems to me that the purpose of the statute has been completely ignored. I think that when a lease of this kind is followed by subsequent leases extending in the aggregate beyond the statutory period, the property should become taxable, if not ab initio, at least from the time of the subsequent lease periods. Otherwise,

the statute is used as a device for evading the payment of taxes when every intention was to lease the property for more than 3 years. I cannot believe that the legislature intended that property could go tax-free simply by drafting a lease for slightly less than 3 years and then continually making subsequent leases for similar periods. If the statute can be so construed, I think it should be amended by the legislature so that when a lease for less than 3 years is followed by subsequent leases whereby the property is held for more than 3 years, it should become taxable at some point in time. I therefore agree with the dissent that in this case the statute was not used as contemplated by the legislature.

This case has been a troublesome one from the beginning. We have heard oral arguments on it twice and have had many conferences among members of the court. I am convinced that careful consideration has been given to the case by all of us even though we are not in agreement.

MR. JUSTICE TODD and MR. JUSTICE MACLAUGHLIN, not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.